UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEDICAID CONSUMERS FOR CONTINUITY OF CARE, ANN WEGMAN, CARMEN RODRIGUEZ, and MELISSA SPENCER, <br><br> *Plaintiffs*, <br><br> - against - <br><br> JAMES V. MCDONALD, in his capacity as the Commissioner of the New York State Department of Health, <br><br> *Defendant.* | No. 1:25-cv-00565(MKV) (KHP) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION AND IN SUPPORT OF DEFENDANT'S <u>MOTION TO DISMISS THE COMPLAINT</u>**

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendant*
28 Liberty Street
New York, New York 10005

Vivian Costandy Michael
Christina S. Parker
Assistant Attorneys General
 *of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

STATUTORY AND REGULATORY FRAMEWORK ..................................................... 6

A.    The Medicaid Program .......................................................................... 6
B.    CDPAP ................................................................................................... 6
C.    The CDPAP Amendment's Modification of Social Services Law § 365-f ............. 8
D.    Rationale for the CDPAP Amendment ................................................... 9
E.    The RFP and the Selection of the Statewide FI ..................................... 10
F.    The Ongoing Transition to the Statewide FI........................................... 10
      PLAINTIFFS' ALLEGATIONS AND EVIDENCE..................................................... 12

STANDARDS OF REVIEW ......................................................................................... 14

I.    Motion to Dismiss................................................................................. 14
II.   Motion for Preliminary Injunction......................................................... 15
      ARGUMENT .......................................................................................... 16

I.    ALL PLAINTIFFS LACK STANDING AND THEIR CLAIMS SHOULD BE
      DISMISSED PURSUANT TO RULE 12(b)(1) ..................................... 16
A.    Plaintiffs Have Not Plausibly Alleged a Concrete Injury ...................... 16
B.    Plaintiffs' Claims Are Not Ripe Because the Only Injury They Allege Is Remote
      and Speculative ...................................................................................... 26
II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE MEDICAID ACT ..... 28
A.    The CDPAP Amendment Does Not Violate the Freedom of Choice Provision.... 29
B.    Plaintiffs Fail to Plausibly Allege Any Other Violations of the Medicaid Act ..... 31
III.  PLAINTIFFS FAIL TO STATE AN *OLMSTEAD* CLAIM UNDER THE ADA OR
      THE REHABILITATION ACT .............................................................. 33
IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER TITLE VI........................... 36
V.    PLAINTIFFS DO NOT PLEAD A COGNIZABLE FOURTEENTH
      AMENDMENT SUBSTANTIVE DUE PROCESS VIOLATION..................... 37
VI.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION .... 39
A.    Plaintiffs Fail to Establish Any of the Prerequisites for a Preliminary Injunction  39
B.    The Balancing of the Equities Favors Defendant ................................... 41

i

C.      Six Other Courts Have Denied Similar Motions to Enjoin the CDPAP
        Amendment's Implementation................................................................................. 42

CONCLUSION.............................................................................................................. 44

WORD COUNT CERTIFICATION ................................................................................ 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967)................................................................26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................15, 36

*Aurecchione v. Schoolman Transp. Sys.*,
  426 F.3d 635 (2d Cir. 2005).....................................................15

*Bay Ridge Diagnostic Lab., Inc. v. Dumpson*,
  400 F. Supp. 1104 (E.D.N.Y. 1975) .........................................30

*Carver v. City of N.Y.*,
  621 F.3d 221 (2d Cir. 2010).....................................................17

*Ciaramella v. Zucker*,
  2019 WL 4805553 (S.D.N.Y. Sept. 30, 2019)...........................35

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)............................................................17, 27

*Coffran v. N.Y.C. Pension Fund*,
  46 F.3d 3 (2d Cir. 1995)...........................................................25

*Collins v. City of Marker Heights*,
  503 U.S. 115 (1992)..................................................................37

*Connecticut v. Duncan*,
  612 F.3d 107 (2d Cir. 2010).....................................................27

*Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l.*,
  790 F.3d 411 (2d Cir. 2015).....................................................15

*Costello v. McEnery*,
  767 F. Supp 72 (S.D.N.Y. 1991)...............................................40

*Davis v. Kosinsky*
  217 F. Supp. 3d 706 (S.D.N.Y. 2016)........................................25

*Davis v. Shah,*
   821 F.3d 231 (2d Cir. 2016)................................................................32, 34

*Dean v. Town of Hempstead,*
   527 F. Supp. 3d 347 (E.D.N.Y. 2021) ...................................................19

*E.B. ex rel. M.B. v. Cuomo,*
   No. 16-cv-735, 2020 WL 3893928 (W.D.N.Y. July 11, 2020) .............34

*Edelson v. Chapel Haven, Inc.,*
   2017 WL 810274 (D. Conn. March 1, 2017).........................................35

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin,*
   733 F.3d 393 (2d Cir. 2013)..................................................................26

*Fac. v. New York Univ.,*
   11 F.4th 68 (2d Cir. 2021) ..........................................................17, 24-25

*Friends of E. Hampton Airport, Inc. v. Town of E. Hampton,*
   841 F.3d 133 (2d Cir. 2016)..................................................................16

*Fulton v. Goord,*
   591 F.3d 37 (2d Cir. 2009)....................................................................33

*Gill v. Whitford,*
   585 U.S. 48 (2018).........................................................................17-18

*Harris v. Olszewski,*
   442 F.3d 456 (6th Cir. 2006) ................................................................29

*Hayden v. County of Nassau,*
   180 F.3d 42 (2d Cir. 1999)....................................................................37

*Henrietta D. v. Bloomberg,*
   331 F.3d 261 (2d Cir. 2003)..................................................................33

*Jeannot v. New York State,*
   No. 24-cv-05896, 2025 WL 80689 (E.D.N.Y. Jan. 13, 2025)
   ..........................................................3-5, 22, 25, 27, 29-32, 35, 43

*Kelly Kare, Ltd. v. O'Rourke,*
   930 F.2d 170 (2d Cir. 1991)..................................................................39

*Lacewell v. Off. of the Comptroller of the Currency,*
   999 F.3d 130 (2d Cir. 2021)..................................................................17

*Lowrance v. Achtyl,*
    20 F.3d 529 (2d Cir. 1994).................................................................................37

*Lujan v. Defenders of Wildlife,*
    503 U.S. 555 (1992)......................................................................................18

*Mahon v. Ticor Title Ins. Co.,*
    683 F.3d 59 (2d Cir. 2012)..............................................................................16

*Matter of A&J Staffing, Inc. v. McDonald,*
    Index No. 912368-24 (Sup. Ct. Albany Cnty. Dec. 19, 2024).................................42

*Matter of Caring Professionals, Inc. v. N.Y.S. Dep't of Health,*
    Index No. 601181/2025 (Sup. Ct. Nassau Cnty. Jan. 27, 2025) ............................43

*Matter of Corning Council for Assistance and Information for the Disabled, Inc. v.*
    *McDonald,*
    Index No. 908147-24 (Sup. Ct. Albany Cnty. Sept. 30, 2024).............................43

*Matter of Eckert v. McDonald,*
    Index No. 94315 (Sup. Ct. Cattaraugus Cnty. Jan. 31, 2025)...............................42

*Matter of Freedom Care LLC v. N.Y.S. Dep't of Health,*
    Index No. 161036/2024 (Sup. Ct. N.Y. Cnty. Nov. 27, 2024) ..............................42

*Moore v. Consol. Edison Co. of N.Y.,*
    409 F.3d 506 (2d Cir. 2005)............................................................................15

*N.Y. Civil Liberties Union v. Grandeau,*
    528 F.3d 122 (2d Cir. 2008)............................................................................27

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.,*
    684 F.3d 286 (2d Cir. 2012)............................................................................17

*New York v. U.S. Dep't of Homeland Sec.,*
    408 F. Supp. 3d 334 (S.D.N.Y. 2019)..............................................................26

*Nicholas v. Trump,*
    433 F. Supp. 3d 581 (S.D.N.Y. 2020)..............................................................17

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999)......................................................................................34

*Pani v. Empire Blue Cross Blue Shield,*
    152 F.3d 67 (2d Cir. 1998)..............................................................................15

*Regents of Univ. of Mich. v. Ewing*,
474 U.S. 214 (1985) (Powell, J., concurring) ........................................................38

*Rodriguez v. City of N.Y.*,
197 F.3d 611 (2d Cir. 1999).................................................................... 32-33

*Save Our Consumer Directed Home Care Program, Inc. v. N.Y.S. Dep't of Health*,
Index No. 907872-24 (Sup. Ct. Albany Cnty. Feb. 7, 2025) ................................29, 35, 39, 43

*Sensational Smiles, LLC v. Mullen*,
793 F.3d 281 (2d Cir. 2015)...............................................................................37

*Sexton v. Medicare*,
194 F. Supp. 3d 209 (E.D.N.Y. 2016) .................................................................25

*Shady v. Tyson*,
5 F. Supp. 2d 102 (E.D.N.Y. 1998) .....................................................................40

*Sierra Club v. Morton*,
405 U.S. 727 (1972)...........................................................................................17

*Simmonds v. Immigration Naturalization Servs.*,
326 F.3d 351 (2d Cir. 2003)......................................................................... 27-28

*Smith v. Half Hollow Hills Cent. Sch. Dist.*,
298 F.3d 168 (2d Cir. 2002)..............................................................................37

*Soule v. Conn. Ass'n of Sch.*,
No. 20-cv-201, 2024 WL 4680533 (D. Conn. Nov. 5, 2024)................................36

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009)...........................................................................................24

*Tom Doherty Assocs., Inc. v. Saben Entm't, Inc.*,
60 F.3d 27 (2d. Cir. 1995)..................................................................................39

*Tough Traveler, Ltd. v. Outbound Products*,
60 F.3d 964 (2d Cir. 1995).................................................................................40

*U.S. v. Salerno*,
481 U.S. 739 (1987)...........................................................................................15

*Union Cosmetic Castle, Inc. v. Amorepacific Cosemtics USA, Inc.*,
454 F. Supp. 2d 62 (E.D.N.Y. 2006) ..................................................................19

*Virgilio v. City of N.Y.*,
    407 F.3d 105 (2d Cir. 2005)...............................................................15

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)........................................................ 16-17

*Wang v. Pataki*,
    396 F. Supp. 2d 446 (S.D.N.Y. 2005)................................................15

*Warth v. Seldin*,
    422 U.S. 490 (1975)..........................................................................16

*Zeno v. Pine Plains Cent. Sch. Dist.*,
    702 F.3d 655 (2d Cir. 2012)..............................................................36

**Federal Statutes**

Americans with Disabilities Act, 42 U.S.C.
    § 12132..........................................................2, 4, 16, 33, 35, 43

Medicaid Act, 42 U.S.C.
    § 1396 *et seq.* ......................................................................2, 6
    § 1396a(a)(8).........................................................................3, 31
    § 1396a(a)(10).............................................................................3
    § 1396a(a)(10)(B)(i)(ii)...............................................................32
    § 1396a(a)(23)......................................................................3, 29
    § 1396a(a)(30)(A)........................................................................6
    § 1396d(a)(1)-(32) ....................................................................29
    § 1396d(a)(24) ..........................................................................30

Rehabilitation Act of 1973, 29 U.S.C.
    § 794(a) ...............................................................................3, 33
    § 504.........................................................................................33

Title XIX of the Social Security Act.................................................6

Title VI of the Civil Rights Act of 1964 ............................. 3, 4, 16, 36-37

**State Statutes**

New York Social Services Law

§ 363 .................................................................................................................6
§ 363-a ..............................................................................................................6
§ 363-a(2) ..........................................................................................................6
§ 365(4-a)(a)(iii) ................................................................................................8
§ 365(4-a)(b)(i)(B) ...........................................................................................23
§ 365-a(2) ........................................................................................................29
§ 365-f .................................................................................................7, 20, 23
§ 365-f(2)(c) ......................................................................................................7
§ 365-f(3) ..........................................................................................................7
§ 365-f(4-1)(a)(ii-b), (b)(i)(B) .........................................................................37
§ 365-f(4-a)(a)(i)-(ii) .........................................................................................7
§ 365-f(4-a)(a)(ii)&(iii) ...................................................................................30
§ 365-f(4-a)(a)(ii)(A)-(J) ..................................................................................8
§ 365-f(4-a)(a)(ii),(iii) .....................................................................................29
§ 365-f(4-a)(a)(ii-a) ...........................................................................................8
§ 365-f(4-a)(a)(ii-b) ...........................................................................................8
§ 365-f(4-a)(a)(ii-b), (b)(i)(B) .........................................................................21
§ 365-f(4-a-1)(a) ................................................................................................9

**State Regulations**

10 NYCRR 505.28(c) .............................................................................................7

18 NYCRR § 505.28(h)(1)(i) .................................................................................7

18 NYCRR 505.14(a)(5) .........................................................................................7

18 NYCRR 505.28 ..................................................................................................7

18 NYCRR 505.28(b)(2) .........................................................................................7

18 NYCRR 505.28(b)(3) .........................................................................................7

18 NYCRR 505.28(e)(1)(v), (j)(1)(vii) ..................................................................8

18 NYCRR
§ 505.28(b)(8) and (j) .......................................................................................7

**Federal Rules of Civil Procedure**

Rule 12(b)(1) ..............................................................................................1, 14-16

Rule 12(b)(6) .....................................................................................1, 15-16, 36-37

Defendant James V. McDonald ("Defendant"), in his official capacity as Commissioner of the New York State Department of Health ("DOH") respectfully submits this memorandum of law in support of his motion to dismiss the Complaint (ECF No. 1) for lack of subject matter jurisdiction and failure to state a cause of action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and in opposition to Plaintiffs' Motion for a Preliminary Injunction against Defendant, ECF No. 5 ("PI Motion").[1]

## PRELIMINARY STATEMENT

This lawsuit is a consequence of a relentless misinformation campaign by a multimillion-dollar industry—funded by taxpayer money—to sow fear and confusion about a reform to the state's Consumer Directed Personal Assistance Program ("CDPAP"), which pays for elderly and chronically ill New Yorkers to get at-home health care by a caregiver of their choice. Given that the reform does not change the level of care or the provider of care for individuals, courts confronting similar lawsuits seeking to block or delay its implementation have repeatedly denied requests for preliminary relief. As explained below, this Court too should deny Plaintiffs' PI Motion and should also dismiss the Complaint for lack of subject-matter jurisdiction and failure to state a claim.

Plaintiffs are three individuals (or "consumers") and a member organization apparently made up of five consumers, including Plaintiffs, who receive personal care services through CDPAP. Under CDPAP, consumers may hire personal assistants ("PAs"), including relatives, to provide them with at-home personal care or nursing services. Fiscal intermediaries ("FIs")

---

[1] In opposition to the PI Motion, and in support of the motion to dismiss pursuant to Rule 12(b)(1), Defendant submits the accompanying Declaration of Amir Bassiri, dated February 10, 2025 ("Bassiri Decl"), the Declaration of Maria Perrin, dated February 10, 2025 ("PPL Decl."), the Declaration of Vivian Costandy Michael, dated February 10, 2025 ("Michael Decl."), and their corresponding exhibits.

provide administrative services to consumers such as processing the PAs' wages and benefits. FIs do not provide healthcare services.

Plaintiffs challenge Part HH of Chapter 57 of the New York Session Laws of 2024, enacted April 20, 2024 ("CDPAP Amendment"), which modifies CDPAP by authorizing one statewide fiscal intermediary ("Statewide FI") to provide these administrative services beginning on April 1, 2025. After a competitive bidding process, DOH timely contracted with Public Partnerships LLC ("PPL") to act as the Statewide FI. PPL has substantial experience providing financial and administrative services on a statewide basis for self-directed care programs throughout the nation. PPL Decl. ¶¶ 9-15.

The CDPAP Amendment was enacted because in New York – unlike in every other state – there are hundreds of FIs in operation, which has led to skyrocketing administrative costs. Bassiri Decl. ¶¶ 10-12. The large and decentralized FI industry diverts hundreds of millions of dollars a year in Medicaid funds away from the provision of actual healthcare to consumers. *Id.* ¶¶ 18-20. Those funds are instead used to pay the FIs' overhead costs. *Id.* When the CDPAP Amendment fully takes effect, all FIs except the Statewide FI and its approved subcontractors must cease operating in CDPAP. *Id.* ¶ 59. In response to the State's efforts to reform this vital program, the FI industry has responded with a barrage of litigation against DOH and other obstructionist tactics in an effort to stall or permanently block the scheduled April 1, 2025 transition to the Statewide FI. *See* PPL Decl. ¶¶ 33-38. Groups of FIs have also succeeded in spreading misinformation and sowing fear among consumers. *Id.*; Bassiri Decl. ¶ 67, Ex. G.

In this lawsuit, Plaintiffs incorrectly claim that the CDPAP Amendment violates certain provisions of the federal Social Security Act concerning the Medicaid program, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Act"), the Americans with Disabilities Act, 42 U.S.C. § 12132 (the

"ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (the "Rehabilitation Act"), Title VI of the Civil Rights Act of 1964 ("Title VI"), and the Substantive Due Process Clause of the United States Constitution. Plaintiffs' Medicaid Act claims cite three provisions concerning: (1) the timing of Medicaid services (the "reasonable promptness of services provision"), (2) the scope of such services (the "comparability provision"), and (3) the consumers' freedom to choose healthcare providers (the "freedom of choice provision"), 42 U.S.C. § 1396a(a)(8), (10) & (23), respectively. Plaintiffs seek a permanent injunction to restrain Defendant from implementing the CDPAP Amendment and a declaratory judgment nullifying it. Plaintiffs also move for a preliminary injunction. Plaintiffs' attempt to undo the State's carefully crafted Statewide FI transition is fatally flawed, and the Complaint should be dismissed.

*First*, Plaintiffs lack standing to bring this action, and it is unripe. Plaintiffs do not plausibly allege that they face a cognizable injury from the transition of CDPAP's administrative services to a Statewide FI or that the transition will diminish or delay the care PAs provide to consumers. Nothing in the CDPAP Amendment impacts consumer eligibility, services, or the quality or continuity of PA services to consumers. Indeed, the requirements for the Statewide FI set forth in the law and DOH's Request for Proposal #20524 for Statewide FI bids (the "RFP") made clear that the selected applicant would have the experience and capability—including language and cultural competencies—to begin rapidly providing administrative services to consumers throughout the State. DOH's timely selection of an experienced Statewide FI with those competencies further undercuts Plaintiffs' alleged fears of an unworkable transition. Just one month ago, the Honorable Hector Gonzalez of the Eastern District of New York dismissed nearly identical claims for lack of standing. *Jeannot v. New York State*, No. 24-cv-05896, 2025 WL 80689 (E.D.N.Y. Jan. 13, 2025). The same analysis applies here.

*Second*, Plaintiffs fail to state any claim under the Medicaid Act. The freedom of choice provision does not confer on Plaintiffs the right to choose an FI because it only mandates a choice among providers of healthcare-related services, such as personal care services, set forth in the Medicaid Act, not the administrative services FIs provide. *See Jeannot*, 2025 WL 80689, at *13 (FIs "do not provide personal care services as defined under the Medicaid Act").

As for Plaintiffs' claims concerning their freedom to choose PAs, the CDPAP Amendment does not require any consumer to change the PAs they currently utilize. Additionally, Plaintiffs fail to state a claim under (1) the reasonable promptness of services provision because they do not plausibly plead that the CDPAP Amendment will delay access to PA services or result in their forced institutionalization; and (2) the comparability provision because the CDPAP Amendment does not distinguish between the medically needy or the categorically needy, nor does it provide differing levels of medical care to CDPAP consumers.

*Third*, Plaintiffs' purely speculative allegations that the CDPAP Amendment could reduce their personal care services which will result in their forced institutionalization are plainly insufficient to state an *Olmstead* claim under either the ADA or the Rehabilitation Act.

*Fourth*, Plaintiffs fail to state a Title VI claim because they do not plausibly allege any intentional discrimination against consumers with limited English proficiency ("LEP").

*Fifth*, Plaintiffs fail to state a cognizable due process claim because they do not plausibly plead that they have suffered, or will imminently suffer, a reduction in or denial of Medicaid services, or that the CDPAP Amendment is irrational or "shocks the conscience." The transition to the Statewide FI was proposed to redirect $500 million a year from administrative FI overhead to avoid needing to cut Medicaid services. Bassiri Decl. ¶¶ 88-93. There is no credible argument that New York's interest in reducing administrative costs without cutting services is irrational.

4

*Finally*, Plaintiffs' PI Motion should be denied because they do not satisfy any of the requirements for this extraordinary and drastic remedy. Initially, they are unlikely to succeed on the merits for the reasons discussed above. Next, Plaintiffs' speculative and conclusory allegations do not suffice to show irreparable harm. DOH and PPL are in the midst of a robust outreach and enrollment period. Bassiri Decl. ¶¶ 60-71; PPL Decl. ¶¶ 44-95. PPL and MCOs are presently engaged in a contracting process that is going as anticipated, and PPL has requested that a small number of MCOs provide advance funding to support PA payroll, which is a common industry practice. PPL Decl. ¶¶ 3, 29-31; Bassiri Decl. ¶¶ 72-73, Ex. D. On February 3, PPL published updated PA wage rates by county. PPL Decl. ¶ 5. Each of these recent developments directly undermines Plaintiffs' speculative argument that PPL lacks sufficient funds to pay PAs upon completion of the transition. It also counsels against premature injunctive relief, particularly given that DOH and PPL still have seven weeks to complete the transition.

Further, the public interest tilts heavily in favor of Defendant. The requested relief would impede the State's effort to save approximately $500 million per year of unnecessary administrative costs to fund over 600 FIs and thus would jeopardize the viability of the entire program. The CDPAP Amendment does not affect consumer eligibility or the care provided to consumers, as FIs are simply administrative middlemen; therefore, any claims that the CDPAP Amendment will affect consumers' care should be rejected. *See Jeannot*, 2025 WL 80689, at *14 (dismissing challenge to the CDPAP Amendment because, *inter alia*, any alleged harm to consumers was entirely speculative). In addition, Plaintiffs' "eleventh hour" preliminary injunction would cause maximum chaos given the status of the extensive transition efforts. Consumers and the public have an interest in the orderly transition to the Statewide FI.

For all of these reasons, and those set forth below, the Complaint should be dismissed with prejudice and in its entirety, and Plaintiffs' PI Motion should be denied.

## STATUTORY AND REGULATORY FRAMEWORK

### A. The Medicaid Program

The Medicaid program was established pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq. *See* Bassiri Decl. ¶ 4. It was designed as a joint state and federal program to provide medical care to those who would be otherwise unable to afford such care. *Id*. Under the terms of the Medicaid program, the federal government contributes a percentage of the funding, referred to as federal financial participation. *Id.* In New York, responsibility for the remaining monies is divided between the State and local governments. *Id.* States and the federal Center for Medicare and Medicaid Services ("CMS") share responsibility for operating Medicaid programs consistent with Title XIX of the Social Security Act and ensuring its overall fiscal integrity. *Id.* ¶ 5. Federal law requires that a State's Medicaid "payments are consistent with the efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A).

DOH is the single State agency responsible for administration of the New York Medicaid Program ("NYS Medicaid Program"). *See* Bassiri Decl. ¶ 6; New York Social Services Law ("SSL") § 363-a. The primary purpose of the NYS Medicaid Program is to make medically necessary covered health and medical services available to eligible individuals. *See* SSL § 363; 42 U.S.C. § 1396. DOH may promulgate all necessary regulations and guidelines for administration of the NYS Medicaid Program. *See* SSL § 363-a(2).

### B. CDPAP

CDPAP is a Medicaid program intended to permit chronically ill and/or physically disabled Medicaid beneficiaries who receive home care services to obtain greater flexibility and freedom of choice by hiring community members—including in certain circumstances family

and friends—to work as their PAs. *See generally* SSL § 365-f; 18 NYCRR 505.28. CDPAP is an authorized benefit to consumers in the State's Plan with CMS. Bassiri Decl. ¶¶ 7-8. CDPAP services, including personal care services such as meal preparation and housekeeping (18 NYCRR 505.14(a)(5)), are available to all eligible Medicaid members including those who receive services through a Medicaid managed care organization ("MCO") or a local department of social services ("LDSS"). *Id.*; *see* 10 NYCRR 505.28(c). Based on the most recent information available to DOH, CDPAP is estimated to serve approximately 280,000 consumers and employs over 300,000 full-time equivalent PAs. Bassiri Decl. ¶ 9.

18 NYCRR 505.28 governs some aspects of CDPAP. *Id.* Eligible individuals who elect to participate in and are determined eligible for CDPAP are referred to as consumers. 18 NYCRR 505.28(b)(2). Consumers may receive assistance with personal care services, home health aide services, and skilled nursing tasks performed by a PA under the instruction, supervision, and direction of the consumer or the consumer's designated representative. SSL § 365-f(2)(c); 18 NYCRR 505.28(b)(3). Each individual consumer is required to assume numerous responsibilities, including but not limited to, recruiting, hiring, training, and supervising their PAs. SSL § 365-f(3), 18 NYCRR § 505.28(h)(1)(i). FIs act as intermediaries and assist the consumers in carrying out their responsibilities by performing administrative services such as wage and benefit processing for PAs, processing all income tax and other required wage withholdings for PAs, and maintaining various records. *See* SSL § 365-f(4-a)(a)(i)-(ii); 18 NYCRR § 505.28(b)(8) and (j).

FIs contract with either MCOs or LDSSs in which the consumers are enrolled. *See* 18 NYCRR § 505.28(e)(1)(v), (j)(1)(vii). MCOs are responsible for developing plans of care for consumers, *id.* § 505.28(d)(3)(v)), and consumers are responsible for managing the plan of care

and training and supervising their PAs. *Id.* § 505.28(h)(i)). FIs are expressly prohibited from performing those tasks. SSL § 365(4-a)(a)(iii).

### C.  The CDPAP Amendment's Modification of Social Services Law § 365-f

The Social Services Law sets forth the role that FI services have in CDPAP, and states that "[FI] services, performed on behalf of the consumer to facilitate the consumer's role as the employer" include services such as "wage and benefit processing for consumer directed personal assistants," "maintaining personnel records for each consumer directed personal assistant including time records" and "maintaining records of service authorizations and reauthorizations." SSL § 365-f(4-a)(a)(ii)(A)-(J).

The CDPAP Amendment was enacted on April 20, 2024, and deemed effective April 1, 2024. Bassiri Decl. ¶ 16. Specifically, the CDPAP Amendment requires any "managed care plans, managed long-term care plans, local social services districts, and other appropriate long-term service programs" offering consumer directed personal care services to contract with the single Statewide FI to provide all FI services to consumers. SSL § 365-f(4-a)(a)(ii-a). As relevant here, the selected Statewide FI shall subcontract the delivery of FI services to "at least one entity per rate setting region" that must (1) "have a proven record of delivering services to individuals with disabilities and the senior population;" (2) "been providing [FI] services since [January 1, 2012];" and (3) be able "to provide any delegated [FI] services with cultural and linguistic competency specific to the population of consumers and those of the available work force." SSL § 365-f(4-a)(a)(ii-b). The statute, however, does not limit the Statewide FI from subcontracting with additional FIs. *See id.*

All currently operating FIs that do not subcontract with the Statewide FI are required to cease operations by April 1, 2025. *See* SSL § 365-f(4-a-1)(a); Bassiri Decl. ¶ 59.

### D.  Rationale for the CDPAP Amendment

It is estimated that more than 600 FIs operate in the State. Bassiri Decl. ¶ 10. The current FI model in New York is an extreme outlier when compared to the rest of the nation, as many states have just one FI and most states have less than three. *Id.* ¶ 11. With more FIs than the rest of the country combined, New York's administrative rate is more than double the average rate paid by other state Medicaid agencies with similar programs and costs of living. *Id.* ¶ 12.

The rationale for the transition to a Statewide FI is two-fold: administrative cost savings and improved efficiency. *Id.* ¶¶ 18-28. The CDPAP comprises more than $9 billion of the NYS Medicaid Program budget. *Id.* ¶ 18. Currently, a substantial portion of CDPAP funding is not used to fund PA services, but rather is funneled to the more than 600 FIs operating in the State to cover their administrative costs. *Id.* ¶¶ 18-19. The shift to a Statewide FI is anticipated to reduce administrative costs incurred by FIs by about $500 million in the next fiscal year. *Id.* ¶ 22; Ex. A (2025 FY Financial Plan). This cost-savings will support the long-term viability of CDPAP and ensure that covered CDPAP benefits and services do not need to be reduced. *See id.* Alternatives would have required substantive cuts to CDPAP, as the budget needed to address the unsustainable growth of the program. *Id.*  ¶¶ 22, 90-93.

Furthermore, CDPAP efficiency will improve with a Statewide FI by allowing DOH to consolidate oversight of FIs and CDPAP. Bassiri Decl. ¶¶ 23-24. Over $9 billion of Medicaid funding flowed through the State's FIs in 2024, exceeding the entirety of Medicaid payments to nursing facilities, which, unlike FIs, are subject to rigorous licensure, regulation, and other standards to promote consumer protections and quality of care. *Id.* ¶ 20. The current number of FIs hinders DOH's monitoring and program integrity efforts. *Id.* ¶ 25. For example, false and misleading marketing and solicitation of consumers to CDPAP remains problematic, as well as the significant disparities among hundreds of operating FIs. *Id.* As such, the use of a single

Statewide FI that contracts with the State will allow DOH to track Medicaid payments and analyze data for patterns that may be indicative of fraud, waste, and abuse, while also allowing the Office of Medicaid Inspector General ("OMIG") to conduct auditing and oversight more efficiently. *Id.* ¶ 26; PPL Decl. ¶ 20.

### E.  The RFP and the Selection of the Statewide FI

The RFP set forth the minimum qualifications for entities to submit bids for the Statewide FI. *See* Bassiri Decl., Ex. C (RFP). After reviewing bids from 136 bidders, DOH informed PPL of its selection as the Statewide FI on September 27, 2024. *See* 9/30/24 Press Release.[2]

PPL provides administrative services for self-directed care in 21 states and has longstanding statewide contracts with 15 Medicaid state programs to provide services akin to FI services, including in states with Medicaid programs comparable in size to New York. PPL Decl. ¶ 13. Indeed, PPL is the largest provider of FI services in the nation. *Id.* ¶ 24. PPL was required to have – and does have – a revolving line of credit totaling $100 million dollars in part to ensure the continued payment of PAs. *Id.* ¶ 27; Bassiri Decl. ¶¶ 39-40, 54, Ex. C.

### F.  The Ongoing Transition to the Statewide FI

Both DOH and PPL are implementing the transition. In the first week of January 2025, DOH, through MCOs and LDSS, began regional distribution of a direct notice to consumers to make them aware of the transition and give them additional information regarding what steps they need to take to register with PPL. Bassiri Decl. ¶ 64.  DOH is currently working with MCOs and LDSS to send a second notice to consumers again informing them they must take action to register with PPL. *Id.*  DOH has issued guidance to MCOs regarding the transition, including

---

[2] Available at https://www.governor.ny.gov/news/governor-hochul-announces-next-steps-plans-strengthen-home-care-services-new-yorkers

guidance on contracting with the Statewide FI, communicating with consumers, and providing certain data to DOH. *Id.* ¶¶ 57-63, Ex. F; Michael Decl., Ex. H. DOH also has issued a notice to MCOs that they should contract with the Statewide FI, and has issued transition guidance to FIs. Bassiri Decl. ¶ 65; Ex. F.

The contracting process between MCOs and PPL is going "as anticipated." PPL Decl. ¶ 3. PPL is negotiating with the 8 largest MCO plans in New York (out of over 60) to participate in a common industry practice of providing advance funding to support PA payroll, as is done nationwide. *Id.* ¶¶ 28-31. In addition, PPL has selected more than 34 existing, FIs as subcontractors and over 30 community-based facilitators, including the four "core" regional home care partners. PPL Decl. ¶¶ 62-63.[3] Another twenty FIs are under review as potential subcontractors as well. *Id.* ¶ 62. On February 3, PPL published information about PA compensation by county, including the minimum base wage rates, benefits, and incentive bonuses for PAs who transition before March 28. PPL Decl. ¶ 5.

As part of its outreach to consumers, DOH is airing public service announcements on television and radio to directly address and refute the FIs' misinformation to consumers. Bassiri Decl. ¶ 66. On February 4, DOH published a letter to consumers countering falsehoods spread by the FI industry. *Id.* ¶ 67, Ex. G. On February 7, 2025, DOH issued a press release including a statement by Defendant that "We're going to continue to push out facts and registration information that home care users need, even as business interests refuse to disclose the source of $10 million in dark money funding the false attacks on our plan"[4] Additionally, PPL confirmed it is "right on track with achieving our forecasted registrations to meet the April 1st timeframe."[5]

---

[3] *See also* list of "CDPAP Facilitators," at https://pplfirst.com/cdpap-facilitators.
[4] Available at https://www.health.ny.gov/press/releases/2025/2025-02-07_cdpap.htm.
[5] *Id.*

*See also* PPL Decl. ¶ 83 ("PPL's transition for the CDPAP to have a statewide fiscal intermediary on April 1, 2025 is going smoothly, well underway, and proceeding according to the agreed upon schedule with DOH.").

PPL has also undertaken  multi-faceted and multi-lingual outreach campaign, including publication of a website with access to 130 language translations, streaming television ads, sending over 200,000 direct emails to consumers, and publishing print ads in 24 publications in 12 languages. PPL Decl. ¶¶ 46-52, 67-76.

## PLAINTIFFS' ALLEGATIONS AND EVIDENCE

The non-conclusory facts alleged in the Complaint are assumed to be truly solely for the purpose of the motion to dismiss.

Plaintiffs are three individuals and one organization.[6] Plaintiffs Ann Wegman and Melissa Spencer are individuals who receive CDPAP services (¶¶ 19-20). Plaintiff Carmen Rodriguez is the designated representative of her mother, Matilde Loarte, who receives CDPAP services (¶ 21). Organizational plaintiff Medicare Consumers for Continuity of Care ("MCCC") is a "member organization and unincorporated association that was formed to advocate for" CDPAP consumers (¶ 18). Its "members are CDPAP Consumers or their designated representatives." *Id.* Plaintiffs and two other declarants claim to be members of MCCC (ECF Nos. 7-11), but they do not allege if there are any members other than those five individuals. MCCC purports to bring the claims in the Complaint not only on behalf of its members, but also "to vindicate the rights of" all 280,000 CDPAP consumers in New York State. *Id.* Plaintiffs do not allege what, if any, actions MCCC has taken on behalf of consumers.

---

[6] Citations to the Complaint are indicated by "¶."

Plaintiffs allege that when the CDPAP Amendment takes effect, consumers will be unable to retain their PAs (¶ 9), will not be able to receive CDPAP services (¶ 10), and will require institutionalization (¶ 14). Plaintiffs broadly attribute these potential harms to two potential, and wholly speculative, outcomes of the CDPAP Amendment. First, Plaintiffs allege that PPL cannot enroll a sufficient number of Consumers by the April 1, 2025 statutory deadline. They allege that neither DOH nor PPL are proactively seeking out consumers to transition to the Statewide FI (¶ 107), largely because "neither of them know the identities or contact information of Consumers and Personal Assistants" (¶ 109). Additionally, Plaintiffs allege that outreach efforts have been limited to English or Spanish, despite that "a large percentage of Consumers do not speak English" (¶ 104). Because other FIs must cease operating by March 31, 2025, Plaintiffs allege "it is a certainty that many Consumers will lose their CDPAP and their [PAs]" on April 1 (¶ 113). If Consumers cannot keep their current FIs, Plaintiffs allege, they "will be placed in grave risk" of death or severe injury, and "many will be forced to move to a nursing home or assisted living facility" (¶ 114). Notably, Plaintiffs do not allege: who their own FI is; whether their FI has joined or applied to join PPL as a subcontractor; whether they or their PAs have begun their transition to PPL; or the status of their or their PAs' transition to PPL.

Second, Plaintiffs attribute their potential harms to PPL's alleged inability to pay PAs (¶ 115), which will allegedly cause PAs to "quit their jobs and leave their Consumers without care" (¶ 125). PPL's alleged inability to pay is premised on three allegations. First, that "PPL has still not signed contracts with most or all of the" MCOs (¶ 122). Second, that PPL will be unable to pay PAs unless it "receives a bailout before it even begins operations" (¶ 125). And, third, that PPL will pay PAs a lower wage than they are earning now (¶ 127). Plaintiffs also allege that

13

PPL's history in other states will "drive Personal Assistants away from PPL and CDPAP altogether" (¶ 128). Notably, Plaintiffs do not allege how much their PAs are currently paid.

Plaintiffs submit several declarations in support of their PI Motion. These include: declarations by the individual Plaintiffs Wegman (ECF No. 8), Rodriguez (ECF No. 9), and Spencer (ECF No. 10); a declaration by MCCC president Kenneth Sternfeld (ECF No. 7); a declaration by MCCC member Rose Jones (ECF No. 11); and declarations by the individual Plaintiffs' current PAs (ECF Nos. 12-16). The individual Plaintiffs affirm the importance of CDPAP services to their ability to remain in their homes and state they would prefer to keep their current FIs and PAs. *See* Wegman Decl. ¶¶ 7-8; Rodriguez Decl. ¶¶ 7, 12, 19; Spencer Decl. ¶¶ 8-9, 12. None of the individual Plaintiffs, Sternfeld, or Jones (together, the "MCCC Members") state they are LEP or have received information regarding the Statewide FI in a language they cannot understand. *See generally* ECF Nos. 7-11. None of the PAs state they will be paid less by PPL than by their current FI(s). *See generally* ECF Nos. 12-16. Neither the PAs nor the MCCC Members identify their current FI(s) or state whether that FI has subcontracted with PPL. *See generally* ECF Nos. 7-16. Nor do any of the MCCC Members identify their MCO. Likewise, none of the MCCC Members or PAs state whether they have begun or completed the transition to the Statewide FI or identify a specific fact preventing the consumer or PA from beginning the transition to ensure continuity of care. *Id.* The MCCC president's declaration similarly is silent on all of these issues regarding any of its other members (assuming there are any), who are not identified or enumerated. *See generally* ECF No. 7.

## STANDARDS OF REVIEW

### I.    Motion to Dismiss

When a defendant moves to dismiss a complaint pursuant to Rule 12(b)(1), "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the

14

evidence." *Aurecchione v. Schoolman Transp. Sys.*, 426 F.3d 635, 638 (2d Cir. 2005).[7] The district court must "construe all ambiguities and draw all inferences in a plaintiff's favor," and then "may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." *Id*. In deciding a Rule 12(b)(1) motion, the court "may also rely on evidence outside the complaint." *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015).

Under Rule 12(b)(6), a complaint must be dismissed "if there are no legal grounds upon which relief may be granted." *Virgilio v. City of N.Y.*, 407 F.3d 105, 111 (2d Cir. 2005). To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facial challenge to a statute is "the most difficult challenge to mount successfully, as the challenger must establish that no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). On a motion to dismiss, the court may consider documents incorporated by reference into the complaint and may take judicial notice of public documents, including regulations and legislative history. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *Wang v. Pataki*, 396 F. Supp. 2d 446, 453 n.1 (S.D.N.Y. 2005).

## II.    Motion for Preliminary Injunction

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). Where "a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1)

---

[7] Unless otherwise indicated, all case citations are cleaned up, with internal quotations and citations omitted.

irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).

## ARGUMENT

The Court should dismiss all claims under Rule 12(b)(1) for lack of subject-matter jurisdiction. Plaintiffs lack standing because they do not allege a concrete injury, and their remote, speculative claims are not ripe for adjudication. Rule 12(b)(6) is an additional or alternative basis for dismissal, as Plaintiffs fail to plausibly allege facts giving rise to a cognizable claim under any Medicaid Act provision, the ADA, the Rehabilitation Act, Title VI, or the Due Process Clause.

## I.  ALL PLAINTIFFS LACK STANDING AND THEIR CLAIMS SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(1)

### A.  Plaintiffs Have Not Plausibly Alleged a Concrete Injury

Plaintiffs do not have standing to bring their claims in this Court. Article III of the United States Constitution limits the subject-matter jurisdiction of the federal courts to "cases" and "controversies." U.S. Const., art. III, 2; *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012). Standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "In order to ensure that this 'bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their 'standing' as 'the proper part[ies] to bring' suit." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). To establish Article III standing, plaintiffs must demonstrate three elements: "(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged action of the

defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by requested relief." *Id.* at 106-07.

To satisfy the first element, the injury must "affect[] the plaintiff in a personal or individual way." *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (explaining that the injury-in-fact requirement is "foremost among" the factors a plaintiff in federal court must establish to satisfy Article III standing); *see also W.R. Huff*, 549 F.3d at 107 ("[T]he injury-in-fact requirement means that a plaintiff must have personally suffered an injury"). Moreover, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972). "To establish standing to obtain prospective relief, a plaintiff must show a likelihood that he will be injured in the future." *Carver v. City of N.Y.*, 621 F.3d 221, 228 (2d Cir. 2010). "[A]llegations of possible future injury are not sufficient," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), nor is mere "past exposure to illegal conduct," *Nicholas v. Trump*, 433 F. Supp. 3d 581, 587 (S.D.N.Y. 2020). Rather, "there must be a substantial risk that the future injury will occur, or the threatened injury must be certainly impending." *Id.*; *see also Lacewell v. Off. of the Comptroller of the Currency*, 999 F.3d 130, 141–42 (2d Cir. 2021).

An organization can only have standing to sue in one of two ways: (1) "[i]t may sue on behalf of its members," in which case it must show, *inter alia*, that at least one of its members "would have had standing to bring the suit individually," or (2) it "can have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012); *see also Fac. v. New York Univ.*, 11 F.4th 68, 75 (2d Cir. 2021). MCCC only asserts a purported injury on behalf of its members, not itself (¶¶ 18, 52).

Here, Plaintiffs have not pled a cognizable injury-in-fact. Plaintiffs allege that the transition to a Statewide FI will not occur by the April 1, 2025 deadline, thus resulting in the MCCC Members' loss of CDPAP services by their chosen PA, based upon their speculations that PPL "cannot handle the job" (¶ 8) and that the transition timeline is not feasible (¶ 102). They also claim that some consumers "have no idea they will lose their CDPAP home care if they do not transition to PPL" (¶ 103) and that "[a]ll consumers are at great risk of losing their [PA]" and "will face an impossible choice between" institutionalization or living at home without care if the transition continues (¶ 142). Plaintiffs further allege there is an "additional risk of disruption of care" for consumers with LEP ( ¶ 160).

Notably absent from the Complaint and supporting declarations, however, are any allegations demonstrating how *these plaintiffs* or MCCC's *actual members* specifically are at risk of losing their services or being forced into an institution. *See Gill*, 585 U.S. at 65. What is more, while Plaintiff MCCC claims that its members are "CDPAP Consumers or their designated representatives," it does not name its members or even state how many there are, and while it purports to "bring these claims on behalf of its members as well as on behalf of, and to vindicate the rights of, all 280,000 Consumers," Plaintiffs do not represent CDPAP consumers as a class (¶ 18). Therefore, Plaintiffs must plead that each MCCC Member suffered a concrete and particularized injury under the CDPAP Amendment. *Lujan v. Defenders of Wildlife*, 503 U.S. 555, 560-61 (1992). They failed to do so.

For example, Plaintiffs make much about PPL's purported lack of outreach to consumers, claiming it will result in the transition not being timely completed. But it is obvious from the pleadings that these Plaintiffs are well aware that the transition is occurring, making any purported lack of outreach irrelevant. Considering that *these* Plaintiffs know that the transition to

PPL must be completed by April 1, 2025, nothing is stopping them from starting the transition process for themselves and their chosen PAs to ensure their transitions are timely completed, or from reaching out to PPL through the many avenues of support it offers for guidance on how to do so. Indeed, Plaintiffs acknowledge that other consumers have already transitioned to PPL and that PPL will begin providing FI services to those consumers on March 1 (¶ 8, n.1). As for MCCC, it does not allege that any of its members are unaware of April 1, 2025 deadline, especially given all of its members joined due to their awareness of the CDPAP Amendment (¶ 13) and since MCCC is clearly aware of the deadline, it could simply inform all of its members.

Even if Plaintiffs have demonstrated a concrete injury on these allegations, they still lack Article III standing because they fail to establish traceability to Defendant. "A plaintiff cannot establish Article III standing to pursue a cause of action where that plaintiff is the primary cause of its own alleged injury." *Union Cosmetic Castle, Inc. v. Amorepacific Cosemtics USA, Inc.*, 454 F. Supp. 2d 62, 71 (E.D.N.Y. 2006). Here, any injury from the MCCC Members' deliberate failure to transition timely to PPL – despite knowing about the ongoing transition – would be self-inflicted or traceable to misleading statements by FIs, not fairly traceable to DOH. *See, e.g.*, *Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 405 (E.D.N.Y. 2021) (plaintiffs' injury from ending operations at their property not fairly traceable to defendant "because ceasing operations and expression…would have been solely Plaintiffs' decision").

In any event, PPL has engaged in significant consumer outreach to effectuate the transition and will continue to do so. *See* PPL Decl. ¶¶ 46-52, 67-76. More than 35,000 consumers have either completed or started registration with PPL (*id.* ¶ 92), and PPL is "on track with call volume and registrations." *Id.* ¶ 89. PPL's support center is staffed who more than

1,100 agents, who speak more than 30 languages and have access to translation services in 300 languages and dialects. *Id*. ¶ 67.

PPL is also engaged in a public education campaign. *Id.* ¶ 46. Outreach has included radio spots on 15 New York radio stations in multiple languages, print ads in 24 publications in 12 languages, distribution of more than 15,0000 flyers at senior and community centers statewide, an information video in 11 languages and American sign language, and over 200,000 direct emails to consumers. *Id.* ¶¶ 67-76. PPL has also held more than 25 virtual and in-person informational and registration sessions; virtual sessions are recorded and available for viewing on the PPL website in multiple languages. *Id.* ¶¶ 47-51. Accommodations for hearing and visually impaired consumers also are available, and consumers can register by phone (not just online). *Id.* ¶¶ 68, 70. PPL also assigns "facilitators" to assist PAs with submitting necessary documents and information to complete the transition by the April 1, 2025, deadline. *Id.* ¶¶ 63-65. PPL's facilitators have more than 150 offices throughout the State. *Id.* ¶ 66. Thus, Plaintiffs' assertion that the transition will not be completed by April 1, 2025, as a result of PPL's purported lack of outreach, lack of language capability, and inability to access "hard-to-reach portions of the consumer market" is simply wrong and unsupported. *See id.* ¶¶ 83, 89.

Plaintiffs also overlook that FIs are required by the CDPAP Amendment to notify consumers that they will cease operations 45 days before April 1, 2025 – *i.e.*, by February 14, 2025. SSL § 365-f (4-d)(a)(i); Bassiri Decl. ¶ 62. The mandatory template notification letter DOH issued to guide FIs with this requirement provides consumers with various options for both themselves and their PAs to register with PPL: via phone (including live translation in approximately 300 languages or teletypewriter), online, or with an approved CDPAP facilitator.

*Id.* ¶ 65.[8] As it is not yet February 14, it is premature to assume that consumers will not be timely notified of the need to transition to PPL and/or be provided the tools and assistance to do so.[9] Further, if consumers are not timely notified, such a result is not fairly traceable to Defendant, but to non-party FIs who fail to comply with that law.

Plaintiffs also make speculative claims that PPL will not be equipped to handle the transition for consumers with LEP. Notably, however, in their supporting declarations, all of which are in English, none of the individual Plaintiffs attests to having LEP and MCCC does not attest that any of its members have LEP. And even if they did, Plaintiffs once again ignore that the CDPAP Amendment expressly identifies cultural and language competency as a principal requirement—both for the selected Statewide FI and its chosen subcontractors. SSL § 365-f(4-a)(a)(ii-b), (b)(i)(B). PPL has met that requirement. Bassiri Decl. ¶ 27 n. 4. PPL and its facilitators speak dozens of languages, can access translation services in hundreds more, and support braille and American Sign Language communications. PPL Decl. ¶¶ 48-50, 63-70.

In a last-ditch attempt to show imminent injury by the CDPAP Amendment, Plaintiffs point to issues that allegedly arose when PPL transitioned to the Statewide FI equivalent in Pennsylvania, relying largely on an audit of the transition by the Pennsylvania Auditor General ("Penn. Audit") (¶¶ 81-88). Significantly, the Pennsylvania transition occurred more than 11 years ago. Penn. Audit at iii. In the intervening years, PPL has provided FI services in 20 other states (Bassiri Decl. ¶¶ 51-52, n.6), and Plaintiffs do not allege or provide evidence that PPL's

---

[8] Consumer Directed Personal Assistance Program (CDPAP) Statewide Fiscal Intermediary Transition Policy for Current Fiscal Intermediaries, FI Discontinue Services Template to Consumer, available at fi_transition_template_fi_to_consumer.pdf (last accessed Feb. 5, 2025).
[9] While Plaintiffs claim that DOH and PPL do not know the identities of all CDPAP consumers and PAs (¶ 109), they ignore that the MCOs that contract with DOH know each consumer enrolled with them, and that the FIs know the identities of both their consumers and PAs, and must notify all of them how to register with PPL.

operations as an FI in those states caused consumers to become institutionalized. Additionally, the Penn. Audit primarily addressed how the Pennsylvania Department of Public Welfare ("DPW") struggled to manage the transition to a single financial management service, rather than PPL's day-to-day role in transitioning Medicaid recipients. Penn. Audit at iii-v.[10] Though Plaintiffs devote much space in the Complaint to this history, it is irrelevant to their claims today.

Plaintiffs' attempts to demonstrate imminent injury by pointing to purported issues with PPL's services in three other states also fail. Plaintiffs cite to an opinion article by an advocacy group in attempting to show that PPL was unable to successfully complete a transition in New Jersey, which is hardly compelling (¶¶ 89-90). They also cite to a purported issue with rollout of a time-keeping system for Medicaid-financed caregivers in Washington that occurred before 2016 (¶¶ 91-92), and claim that PPL mismanaged disbursement of COVID-19 rental relief in Oregon ( ¶¶ 93-97). Aside from the fact that the Washington rollout occurred a decade ago and that the Oregon audit was entirely unrelated to Medicaid or CDPAP, "even if such transitions were comparable to the transition that New York [is undergoing] . . . not a single Consumer Plaintiff specifically alleges that they will likely face an increased *personal* risk of institutionalization as a result of the CDPAP Law, even in the most attenuated manner." *Jeannot*, 2025 WL 80689, at *7. Moreover, PPL has Statewide FI contracts in 15 other states and is the sole FI in Arkansas, Indiana, New Jersey, Ohio, and Oregon. PPL Decl. ¶¶13-15. Most importantly, Plaintiffs have not alleged that any consumer in any state where PPL operates was forced into an institution as a result of PPL's transition to a Statewide FI.

---

[10] Moreover, the Penn. Audit was critical of DPW's delay in contracting with PPL, which reduced by two months the time PPL had to effect the transition. Penn. Audit at 25-29. The CDPAP Amendment authorizes one year for DOH to effect the transition here. But Plaintiffs' requested preliminary injunction would reduce this period at a critical juncture— potentially causing the same problems that Plaintiffs decry in the shortened DPW transition.

Plaintiffs also repeatedly ignore that the CDPAP Amendment only switches the entities that will perform administrative tasks for consumers; it does not require any change to who performs their personal assistance services, nor does it change the level of care and benefits consumers receive from CDPAP. *See generally* SSL § 365-f. To the contrary, the law and the RFP both contain provisions that make certain consumers' benefits are not reduced or delayed, such as ensuring that the Statewide FI accepts consumers in all service areas, has experience serving individuals with disabilities, and that it has the appropriate cultural and linguistic competencies to serve consumers and PAs. SSL § 365(4-a)(b)(i)(B); RFP at 8, 21, 29. In addition, any bidder, including PPL, was required to attest that they would "[e]nsur[e] full and timely payment of wages" to PAs, and that they would coordinate PAs' benefits, including leave and health insurance. *See* RFP at 29-30 (Bidder's Demonstration of Eligibility to Submit a Bid).

Finally, regarding Plaintiffs' claims that PPL will be unable to timely pay PAs, resulting in loss of PA services, PPL has demonstrated to DOH that it can maintain a revolving line of credit for at least $100 million to ensure sufficient liquidity to meet worker payroll obligations. Bassiri Decl. ¶ 54; PPL Decl. ¶ 27. Further, PPL is negotiating with a small number of MCOs to participate in a common industry practice of providing payroll funds to PPL in advance of PA payroll being disbursed. PPL Decl. ¶¶ 3, 29-30. This is a common industry practice nationwide and not unique to New York. *Id.* ¶ 31; Bassiri Decl. ¶¶ 72-73. Contract negotiations between MCOs and PPL continue to progress. PPL Decl. ¶ 3. Moreover, Plaintiffs' contentions that PPL is offering minimum wage of $19.10 per hour to PAs of New York City-based consumers is meritless (¶ 127). PPL's minimum base wage for PAs serving consumers who live in New York City is $20.10 per hour. PPL Decl ¶ 5.

Finally, "plaintiffs claiming organizational standing" are required "to identify members who have suffered the requisite harm." *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009). In *Faculty v. New York Univ.*, plaintiff "Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP"), a membership association," commenced an action challenging defendant New York University Law Review's practice of considering race and sex in its editor-selection and article-selection process, in addition to the law school's faculty hiring process. 11 F.4th 68, 71-72 (2d Cir. 2021). The Second Circuit held that FASORP failed to establish standing because it failed to sufficiently identify members who had suffered the requisite harm. *Id.* at 75-76. In its complaint, FASORP alleged that its members included "faculty members or legal scholars who have submitted articles to the Law Review in the past, and who intended to continue" submitting articles "in the future," and "individuals who have sought and applied for entry-level or lateral teaching positions at the Law School and intend to do so again in the future" or "remain potential" candidates. *Id.* at 76. The Court held that "[s]uch allegations are plainly insufficient to show that FASORP's members have suffered the requisite harm." *Id.* It explained that, "even if 'naming names' and submitting individual affidavits is not required" to establishing standing, FASORP was required "to be more specific" by, for example, articulating when its members submitted articles or jobs or planned to do so. *Id.*

Here, the pleadings provide even less specificity than those in *Faculty*. The Complaint alleges only than that MCCC's "members are CDPAP Consumers or their designated representatives" (¶ 18). Plaintiffs do not allege how many members MCCC has or identify them, other than the individual Plaintiffs, its president Sternfeld, and declarant Jones. ECF Nos. 7-11. Plaintiffs provide no information specifying how or why any of its members – including those that are identified – will be unable to timely transition to PPL and continue their CDPAP

benefits. As noted above, Plaintiffs and the declarants all are aware that the transition to a Statewide FI is underway. ECF Nos. 7 ¶ 11; 8 ¶ 8; 9 ¶  12; 10 ¶ 12; 11 ¶ 9. Plaintiffs cannot manufacture their own standing by refusing to enroll with PPL, and Plaintiffs do not allege whether any MCCC member has enrolled or begun the enrollment process with PPL, let alone demonstrated that any enrolled member will lose their PA services after April 1, 2025. Accordingly, Plaintiffs failed "to show that [MCCC's] members suffered the requisite harm here." *Faculty*, 11 F.4th at 76.

In sum, just like the Consumer Plaintiffs in *Jeannot*, Plaintiffs here raise only "hypothetical concern[s] – that if [their] PAs are not able to transition to the Statewide FI in time, then Plaintiffs' prompt access to CDPAP services will be impaired – [which] are too conjectural and based on future events that may not come to pass." *Jeannot*, 2025 WL 80689, at *6; *see Coffran v. N.Y.C. Pension Fund*, 46 F.3d 3, 4 (2d Cir. 1995) ("Article III court[s] cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all."); *Davis v. Kosinsky* 217 F. Supp. 3d 706, 712 (S.D.N.Y. 2016) (dismissing plaintiff's claims for failure to allege a sufficiently concrete injury where to credit plaintiff's assertion regarding the harms he was facing, the court would have to "engage in conjecture" and "assume" certain events would occur, which would require the court to "entangle itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur"); *Sexton v. Medicare*, 194 F. Supp. 3d 209, 215 (E.D.N.Y. 2016) (dismissing plaintiff's claims for lack of standing because he alleged "only a potential for injury that has not yet occurred and because that potential is born of nothing more than hypothesis and conjecture"). Accordingly, the Plaintiffs lack standing to pursue their claims and the Complaint should be dismissed for lack of subject matter jurisdiction.

**B.  Plaintiffs' Claims Are Not Ripe Because the Only Injury They Allege Is Remote and Speculative**

Ripeness "encompasses two overlapping doctrines concerning the exercise of federal jurisdiction," one based on the Constitution and the other based on prudential considerations. *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013).

The first doctrine, constitutional ripeness, "overlaps with the standing doctrine, most notably in the shared requirements that the plaintiff's injury be imminent rather than conjectural or hypothetical." *New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 344 (S.D.N.Y. 2019), *aff'd as modified*, 969 F. 3d 32 (2d Cir. 2020). For purposes of constitutional ripeness, Plaintiffs' claims are unripe because they do not allege an imminent and concrete injury. For the reasons set forth in Section I(A), above, their alleged injuries are remote and hypothetical. Plaintiffs do not plausibly allege how the transition to a Statewide FI will lead to the MCCC Members losing care from their preferred PAs, experiencing forced institutionalization, or delaying the delivery of PA services. Indeed, there is nothing in the CDPAP Amendment that prevents consumers from retaining the PAs they have chosen. The consumers and PAs will now simply work with the selected Statewide FI and its subcontractors to handle payroll and compliance with record-keeping requirements, rather than contend with 600 different entities.

The second doctrine, prudential ripeness, is "'an important exception to the usual rule that where jurisdiction exists a federal court must exercise it,' and allows a court to determine 'that the case will be better decided later.'" *Id.* (quoting *Simmonds v. Immigration Naturalization Servs.*, 326 F.3d 351, 357 (2d Cir. 2003)). Prudential ripeness serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

To determine prudential ripeness, a court must consider: (1) whether the issues presented to the district court are fit for review, and (2) what hardship the parties will suffer in the absence of review. *Connecticut v. Duncan*, 612 F.3d 107, 113 (2d Cir. 2010) (citing *Abbott Labs*, 387 U.S. at 148-49). The "fitness" inquiry addresses "whether the issues sought to be adjudicated are contingent on future events or may never occur." *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 132 (2d Cir. 2008). The "hardship" inquiry addresses "whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* at 134. "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds*, 326 F.3d at 360. Plaintiffs' claims fail both inquiries.

Plaintiffs' alleged injury is premised upon a number of speculative events that may never occur: that PPL will fail to transition them or MCCC's members by April 1, 2025 (¶ 99), so it will be unable to pay their PAs (*id.* ¶ 115), leading PAs to abandon their loved ones without care or replacement caretakers (*id.* ¶¶ 128-30), and resulting in their forced institutionalization (*id.* ¶ 142). However, "a speculative chain of possibilities does not establish that injury based on potential future [action] is certainly impending." *Clapper*, 568 U.S. at 414; *Jeannot*, 2025 WL 80689, at *6 (Plaintiffs' allegations that PPL "*may not* be able to provide the same level of care and attention, including language and cultural competence, that their current FIs provide, and . . . their PAs *may* choose not to transition with them to the Statewide FI . . . [and] they *may* receive diminished CDPAP services . . . [are] insufficient to establish Article III standing").

The February 3 publication by PPL of PA compensation details, including minimum base wage rates that are *higher than* minimum wage, is a prime example of the wisdom of prudential ripeness. Plaintiffs alleged that "PPL has not published wage information, but it has been long assumed that PPL will cut Personal Assistants' hourly rate," (¶ 127), asserting that it is certain

some consumers would lose their PAs due to the inevitable resignation of PAs who will be paid less than they earn now (¶ 127). But in mere days since the Complaint was filed, PPL *did* publish PA hourly rates. PPL Decl. ¶ 5. As the published information shows, PPL is offering New York City PAs a higher hourly rate than the New York City minimum wage – again, contrary to Plaintiffs' assumptions. *Id.* With implementation underway and facts rapidly changing, there was, and is, no need for the Court to credit Plaintiffs' hypotheticals and enjoin the continued implementation of the CDPAP Amendment.

Similarly, Plaintiffs will not suffer hardship in the absence of judicial intervention. Hardship "involves an evaluation of whether the challenged action creates a direct and immediate dilemma for the parties." *Simmonds*, 326 F. 3d at 360. For the same reasons that Plaintiffs do not satisfy the requirements of standing, constitutional ripeness, and irreparable harm (discussed *infra* Section VI(A)), they fail the hardship inquiry and cannot make any showing of a direct or immediate dilemma. Plaintiffs are aware of the need to transition themselves and their chosen PAs to PPL in advance of the April 1, 2025, deadline and have been provided the means to do so. Plaintiffs and MCCC's members cannot refuse to take steps to transition to PPL and then blame the Defendant if that transition is not timely effectuated.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE MEDICAID ACT

Plaintiffs' Medicaid Act claims also must be dismissed because Plaintiffs do not state a cognizable claim under the "freedom of choice," "reasonable promptness," or "comparability" provisions of the statute.

### A. The CDPAP Amendment Does Not Violate the Freedom of Choice Provision

#### 1. There Is No Right to Choose FIs Because FIs Do Not Provide Care or Services Under the Medicaid Act.

Plaintiffs argue that the CDPAP Amendment violates the freedom of choice provision because the amendment allegedly prevents consumers from obtaining medical assistance from entities that are "qualified to perform the service or services required," 42 U.S.C. § 1396a(a)(23). However, the freedom of choice provision does not apply to FI services because they are not included in the list of services set forth in the Medicaid Act. Indeed, as the Court held in *Jeannot*, "under a plain reading of the statute, FIs are not providers of personal care services" and fall outside the scope of the freedom of choice provision. 2025 WL 80689, at *13. On February 7, 2025, yet another court agreed that freedom of choice does not extend to FIs. *See* Michael Decl., Ex. G (Decision and Order, *Save Our Consumer Directed Home Care Program, Inc. v. N.Y.S. Dep't of Health*, Index No. 907872-24 (Sup. Ct. Albany Cnty. Feb. 7, 2025), at 27 (denying preliminary injunction)). Accordingly, Plaintiffs' argument should be rejected here too.

The Medicaid Act enumerates the types of care and services that constitute "medical assistance," which include, *inter alia*, inpatient hospital services, laboratory and X-ray services, physicians' services, and home health care services. 42 U.S.C. § 1396d(a)(1)-(32); *see also* SSL § 365-a(2) (setting forth the types of "medical, dental and remedial care, services, and supplies" covered by Medicaid). The list of services does not include those provided by FIs, which act as third-party *fiscal* intermediaries and provide administrative services such as wage and benefit processing to consumers. SSL § 365-f(4-a)(a)(ii),(iii). These administrative functions plainly differ from those found to constitute "services" under the Medicaid Act. *See Harris v. Olszewski*, 442 F.3d 456, 464 (6th Cir. 2006) (freedom of choice provision extended to incontinence products, as "medical assistance" was defined to include "home health care services," which

regulations defined to include "medical supplies" required for use in one's home though ultimately, exception to freedom of choice provision applied); *Bay Ridge Diagnostic Lab., Inc. v. Dumpson*, 400 F. Supp. 1104, 1107 (E.D.N.Y. 1975) (holding that the provision encompasses freedom to choose provider of laboratory services, as the definition of "medical assistance" includes "laboratory and x-ray services").

While the provision of "personal care services" is medical assistance under the Medicaid Act, *see* 42 U.S.C. § 1396d(a)(24), it is PAs who provide those services, and consumers remain free to select their PAs under the CDPAP Amendment. *See Jeannot*, 2025 WL 80689, at *13. FIs, in contrast, provide administrative services. SSL § 365-f(4-a)(a)(ii)&(iii). Accordingly, FIs "do not provide personal care services as defined under the Medicaid Act" and are not "qualified providers" covered by the freedom of choice provision. *Jeannot*, 2025 WL 80689, at *13.

### 2. Plaintiffs Have Free Choice of PAs

Plaintiffs argue that the CDPAP Amendment violates the freedom of choice provision by baselessly claiming that "some Consumers are certain to lose their [PA]" (¶ 151). Plaintiffs do not dispute that, under the CDPAP Amendment, they retain the right to select any PA of their choosing but argue that they may lose their PA if PPL pays them less or does not pay them on time (¶ 152). But those allegations are purely speculative and do not demonstrate that any individual plaintiff or MCCC member is at risk of losing his or her PA. Moreover, Plaintiffs do not allege that their PAs are currently paid above the minimum wage such that they could be paid a lower wage after the transition.

The case cited by Plaintiffs to argue otherwise is distinguishable. *Bay Ridge Diagnostic Laboratory, Inc. v. Dumpson*, 400 F. Supp.at 1105. In *Bay Ridge*, New York City enacted a program in which exclusive contracts for all Medicaid services would be awarded to one laboratory in each of four of the City's five boroughs. *Id.* Here, in contrast, the CDPAP

30

Amendment imposes no restriction on consumers' choice of PAs, and Plaintiffs' speculative fears that they may lose their chosen PA are insufficient to state a claim.

**B.  Plaintiffs Fail to Plausibly Allege Any Other Violations of the Medicaid Act**

Plaintiffs also fail to state a claim under the Medicaid Act's reasonable promptness of services provision and comparability provision.

Plaintiffs claim that the transition to a Statewide FI violates the provision requiring medical assistance to "be furnished with reasonable promptness to all eligible individuals" (42 U.S.C. § 1396a(a)(8)) because "any Consumers who PPL does not enroll by April 1, 2025, will lose their care" (¶ 156). This presumes that Plaintiffs, MCCC's members, and their PAs will not be enrolled with PPL before that date. As detailed above, this contention is purely speculative, and Plaintiffs and MCCC's members, who should certainly be aware of the upcoming transition deadline, already can register themselves and their PAs with PPL.

In other words, akin to their failure to establish standing, Plaintiffs' "reasonable promptness" claim fails because it is again premised upon a series of future events that may never occur: *if* "PPL does not enroll" consumers by April 1, 2025, and "*if* a Consumer loses their" PA, that *could* "create an interruption in care" which *may* "take a long time to cure" (¶¶ 155-56). But nothing in the CDPAP Amendment requires consumers to change PAs, reduces their level of PA services, or delays PA services or payments to PAs.

Further, Plaintiffs claim that the CDPAP Amendment "deprives Plaintiffs . . . of CDPAP services to which they are entitled" (¶ 195). Notably, in *Jeannot*, the Court dismissed the consumer plaintiffs' "reasonable promptness" claim on standing grounds, holding that they failed to "show[] that there is a material risk that this harm [*i.e.*, a delay in their CDPAP services] will come to pass." 2025 WL 80689, at *8. However, the Court also noted that, had it considered that claim on the merits, it would have dismissed it to the extent it was "premised upon the loss of

their FIs" given its holding that FIs do not provide medical assistance. *Id.* at *13, n. 9. To the extent the "services" Plaintiffs claim they will lose are the loss of their FIs, their reasonable promptness claim fails for that reason as well.

Plaintiffs also allege that the CDPAP Amendment violates the comparability provision of the Medicaid Act (42 U.S.C. § 1396a(a)(10)). *See* ¶ 158, 200-09. The comparability provision states that "the medical assistance made available to any [categorically needy] individual described in subparagraph (A)(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and (2) shall not be less in amount, duration, or scope of the medical assistance made available to [categorically needy] individuals not described in subparagraph (A)." 42 U.S.C. § 1396a(a)(10)(B)(i)(ii). Its purpose is to "ensure that the primary concern of the states providing financial assistance should be those persons who lack sufficient income to meet their basic needs—termed the categorically needy." *Rodriguez v. City of N.Y.*, 197 F.3d 611, 616 (2d Cir. 1999). "Section 1396a(a)(10)(B) guarantees that if a state elected to provide Medicaid to the medically needy, it must also provide it to the categorically needy and that it may not provide more assistance to the former group than the latter." *Id.* Additionally, a state cannot discriminate amongst the categorically needy by "providing different amounts, durations, or levels of medical care to individual beneficiaries within any one categorically needy group." *Davis v. Shah*, 821 F.3d 231, 257 (2d Cir. 2016).

DOH's implementation of the CDPAP Amendment does not implicate the comparability provision because it does not distinguish between the medically needy and the categorically needy or among the categorically needy. The comparability provision also does not apply because the implementation of a Statewide FI does not provide differing levels of medical care to CDPAP consumers. The only proper application of the comparability provision is "in situations

32

where the same benefit is funded for some recipients but not others." *Rodriguez*, 197 F.3d at 617.
Here, there is no dispute that the CDPAP Amendment will transition all Medicaid beneficiaries
in CDPAP to the Statewide FI. Thus, there is no distinction between categories of CDPAP
consumers , and Plaintiffs' comparability challenge is meritless.

### III.    PLAINTIFFS FAIL TO STATE AN *OLMSTEAD* CLAIM UNDER THE ADA OR THE REHABILITATION ACT

Plaintiffs also fail to state a claim under the ADA and the Rehabilitation Act. Title II of
the ADA provides that "no qualified individual with a disability shall, by reason of such
disability, be excluded from participation in or be denied the benefits of the services, programs,
or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §
12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified
individual with a disability . . . shall, solely by reason of her or his disability, be excluded from
the participation in, be denied the benefits of, or be subject to discrimination under any program
or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (2000). Because the
standards imposed on public entities by Title II of the ADA are generally equivalent to those of
Rehabilitation Act § 504, courts "treat claims under the two statutes identically" in most cases.
*Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). To state a claim under either
statute, a plaintiff must establish "(1) that she is a qualified individual with a disability; (2) that
she was excluded from participation in a public entity's services, programs or activities or was
otherwise discriminated against by a public entity; and (3) that such exclusion or participation
was due to her disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

Plaintiffs' ADA and Rehabilitation Act claims are based solely on their concatenated
assumptions that "all Consumers are at risk of losing their chosen caregivers and are at risk of
institutionalization" *if* (1) PPL does not transition consumers or their PAs by April 1, 2025, *or*

(2) PPL is unable to function as a Statewide FI, *or* (3) PPL is unable to reach consumers in "hard to reach markets" (¶ 139). These wholly speculative claims based upon a hypothetical chain of events clearly fails to state a claim under either statute. *See E.B. ex rel. M.B. v. Cuomo*, No. 16-cv-735, 2020 WL 3893928, at *6 (W.D.N.Y. July 11, 2020) (finding that allegations that a state policy would lead to plaintiffs' institutionalization were "too tenuous" and based on a "hypothetical chain of events" and that therefore plaintiffs had "not plausibly alleged that the state's [actions] now will likely result in their institutionalization in the future").

In *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 607 (1999), the Supreme Court held that the "unjustified institutionalization of persons with disabilities" is, in and of itself, a prohibited "form of discrimination." Consistent with that holding, the Second Circuit has held that a plaintiff may state a valid claim for disability discrimination by demonstrating that the defendant's actions pose a serious risk of institutionalization for disabled persons. *See Davis*, 821 F.3d at 263. In *Davis*, the State amended its Medicaid plan to restrict coverage of orthopedic footwear and compression stockings to a narrow set of medical conditions for disabled persons. *Id.* at 240-41. Plaintiffs were individuals who were excluded from access to those benefits due to the amendment. *Id.* at 260. It was undisputed in *Davis* that the loss of coverage, which had already occurred pursuant to the express terms of the amendment, "would lead to [the plaintiffs'] institutionalization." *Id.* at 261. The Second Circuit concluded that, "[b]y subjecting those plaintiffs to an increased risk of institutionalization, New York's coverage restrictions 'exclude [disabled persons] from participation in a public entity's services . . . due to [their] disability.'" *Id.* at 261 (quoting *Fulton*, 591 F.3d at 43).

The instant case is readily distinguishable from *Davis.* First, the terms of the CDPAP Amendment do not deny MCCC Members any benefits or access to services. Rather, they will

continue to receive personal care services without reduction after the transition to a Statewide FI. Where a plaintiff fails to allege "that the State defendants have actually changed the type or amount of services," she fails to state a claim under the integration mandate. *Edelson v. Chapel Haven, Inc.*, 2017 WL 810274, at *9, 15-cv-1862 (D. Conn. March 1, 2017). Here, Plaintiffs have no well-pled allegations supporting their claim that Defendants will actually reduce or eliminate their CDPAP benefits under the CDPAP Amendment.

Moreover, Plaintiffs' contention that MCCC Members are at serious risk of institutionalization is based upon pure speculation that the CDPAP Amendment *might* cause an interruption in their PA services, which *might* result in their forced institutionalization (¶ 139). But this does not state a claim. *Compare Ciaramella v. Zucker*, 2019 WL 4805553, at *11, 18-CV-6945 (S.D.N.Y. Sept. 30, 2019) (mere allegation that Plaintiffs were "at risk of institutionalization because of their lack of dental implants," without "alleg[ing] any facts to support [that] notion," failed to state a claim); *with Davis*, 821, F.3d at 263-64 (undisputed loss of access to orthopedic footwear and compression stockings would "severely exacerbate their ailments, putting them at a substantial risk of institutionalized care"). Indeed, like in *Jeannot,* Plaintiffs here fail to make "allegations specifically asserting that any particular Consumer Plaintiff risks institutionalization as a result of a state failure to provide necessary services." *Jeannot*, 2025 WL 80689, at *7; *see also* Michael Decl., Ex. G, *Save Our Consumer Directed Home Care Program*, Index No. 9078272-24 at 27-28 (denying preliminary injunction and holding "to the extent that respondents actions are alleged to have placed consumers at risk of institutionalization in violation of . . . . the ADA, the Court finds that any such allegation is speculative."). Accordingly, their claims under the ADA and Rehabilitation Act should be dismissed.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER TITLE VI

Plaintiffs do not state a claim for relief under Title VI, which "prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). A Title VI claim requires a showing of intentional discrimination by the federal funds recipient. *Zeno*, 702 F.3d at 664 (citing *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001)). The intentional discrimination requirement forecloses disparate impact claims. *See, e.g.*, *Soule v. Conn. Ass'n of Sch.*, No. 20-cv-201, 2024 WL 4680533, at *8 (D. Conn. Nov. 5, 2024) (citing cases and stating "because Title VI's text prohibits only intentional discrimination, its private right of action encompasses claims based on disparate treatment, which require intentional discrimination, but not claims based on disparate impact, which have no such requirement.").

Tellingly, none of the individual Plaintiffs allege that they themselves are LEP, which is logically inconsistent with any argument that the state is intentionally discriminating against them. *See* ¶ 21 (Rodriguez); ¶¶ 20, 29, 40, 117-18 (Spencer); ¶¶ 19, 29, 40, 117-18 (Wegman). Instead, the Complaint relies on broad statements like "there are many Consumers who do not speak English" (¶ 6) and "a large percentage of Consumers do not speak English" (¶ 104). These conclusory and generalized statements cannot survive a Rule 12(b)(6) motion. *See Iqbal*, 556 U.S. at 678 (a complaint that "tenders naked assertion[s] devoid of further factual enhancement" will not suffice). As for MCCC, the Complaint is conspicuously silent as to how many consumers or personal representatives are members and whether any of its members are LEP. *See* ¶ 18 ("Its members are CDPAP Consumers or their designated representatives"). Indeed, the two non-Plaintiff declarants who claim they are members of MCCC do not allege they are LEP. ECF No. 7 (Sternfeld); ECF No. 11 (Jones). The MCCC Members thus fail to show that they have been discriminated against.

Nor do Plaintiffs assert any plausible allegations of intentional discrimination by DOH or any of its officials with regard to language assistance for any consumers. On the contrary, the CDPAP Amendment and the RFP expressly identify cultural and language competency as a principal requirement both for the selected Statewide FI and its chosen subcontractors. SSL § 365-f(4-1)(a)(ii-b), (b)(i)(B); RFP at 4, 5, 8, 21, 23, 29 (same).[11] Because Plaintiffs fail to state a Title VI claim, the Court should dismiss the fifth cause of action.

## V.   PLAINTIFFS DO NOT PLEAD A COGNIZABLE FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS VIOLATION

Plaintiffs' substantive due process claim should be dismissed under Rule 12(b)(6). "The law in [the Second] Circuit is clear that where . . . a statute neither interferes with a fundamental right nor singles out a suspect classification, [courts should] invalidate that statute on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose." *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015). Moreover, substantive due process only protects against "egregious conduct which . . . can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002); *Collins v. City of Marker Heights*, 503 U.S. 115, 125-28 (1992). It does not forbid government actions that might be deemed arbitrary or capricious, *see id.*, nor does it protect "against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994). Here, Plaintiffs allege that the CDPAP Amendment violates their substantive due process rights because it deprives them of their "rights to life, liberty, bodily safety and

---

[11] The Complaint cites to the RFP and references it extensively. *See* ¶¶ 65-74, 77, 90, 107-08, 121. Because the RFP is incorporated by reference in the Complaint, it is properly considered on a Rule 12(b)(6) motion. *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)

bodily integrity" and thus "shocks the conscience," and that it deprives them "constitutionally protected interests in their home care under CDPAP."[12]

Initially, although Defendant does not dispute that Plaintiffs, once they were deemed eligible, have a property interest in receiving personal care services through Medicaid protected by *procedural* due process, it does not follow that such property rights are protected by the *substantive* due process clause. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring) ("Even if one assumes the existence of a property right, . . . not every such right is entitled to the protection of *substantive* due process," which rights "are created only by the Constitution."). Regardless, the CDPAP Amendment does not deprive Plaintiffs of any protected property interest because the amendment does not alter, reduce, or eliminate Plaintiffs' CDPAP services. For the same reasons, the CDPAP Amendment also does not deprive Plaintiffs of their "rights to life, liberty, bodily safety and bodily integrity." Indeed, Plaintiffs fail to allege how a transition to a Statewide FI, that will provide the same payroll and other administrative services to their PAs as is being provided by the 600 plus FIs currently operating in the State, will reduce their CDPAP services such that their due process rights would be violated. As a result, Plaintiffs' fail to plausibly allege that the CDPAP Amendment "shocks the conscience."

Further, Plaintiffs do not have a cognizable liberty interest in selecting an FI of their choice that would implicate procedural due process, let alone substantive due process. This is because "freedom of choice is an indirect Medicaid benefit, unlike financial assistance which is a direct benefit." *Construction and Application of Medicaid Act's "Free Choice of Provider" Provision*, 85 A.L.R. Fed. 2d 201 § 22 (2014) (citing *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170 (2d Cir. 1991)). And "state action that incidentally burdens an indirect governmental benefit does

---

[12] Plaintiffs do not claim they are members of a suspect class. *See* ¶¶ 220-230.

not rise to the level of a deprivation of a liberty interest." *Kelly Kare, Ltd*, 930 F.2d at 178 (citing *O'Bannon v. Town Court Nursing Ctr.*, 447, U.S. 773, 786-88 (1980)). Here, Plaintiffs' direct benefits have not been altered—they will continue to receive personal care services under the CDPAP Amendment with the same PAs. As such, to the extent that Plaintiffs have suffered any burden with the implementation of the CDPAP Amendment, such burden is incidental and does not infringe on any liberty interests.

Plaintiffs are also incorrect that "the CDPAP Amendment itself and its implementation each have no rational basis" (¶ 224). Once again, Plaintiffs erroneously claim that the CDPAP Amendment will "result in Consumers' death, severe medical crisis, severe injury, and/or forced institutionalization" (¶ 222). But the CDPAP Amendment does not change the CDPAP services consumers will receive. Indeed, the amendment is wholly rational because it is estimated to save hundreds of millions of dollars in administrative costs each year, which funds can therefore be redirected to actual patient care. Just last week, the court in *Save Our Consumer Directed Home Care Program, Inc.* rejected the argument that Statewide FI transition was irrational, holding that DOH had "identified a rational basis for . . . the statutory amendments and the need to regulate the unregulated FI industry," among other reasons. *See* Michael Decl., Ex. G at 29.

Accordingly, Plaintiffs' substantive due process claim, and all of their other claims, must be dismissed for failure to state a cognizable claim.

## VI.    PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

### A.  Plaintiffs Fail to Establish Any of the Prerequisites for a Preliminary Injunction

For all the foregoing, Plaintiffs cannot establish probable success on the merits. They also cannot demonstrate irreparable harm, *i.e.*, an injury that is not remote or speculative but "actual and imminent." *Tom Doherty Assocs., Inc. v. Saben Entm't, Inc.*, 60 F.3d 27, 37 (2d. Cir. 1995).

Plaintiffs fail to satisfy this requirement because the injuries they allege – that the CDPAP Amendment will force them to lose their PAs, impede their access to personal care services, and lead to their forced institutionalization – are purely speculative. No Plaintiff has submitted any evidence that the CDPAP Amendment likely will prevent them from choosing their preferred PA or eliminate or reduce their level of CDPAP services. They also fail to proffer any evidence as to how they will be forced into institutions through the implementation of the CDPAP Amendment. Instead, Plaintiffs speculate that "[i]f PPL fails to pay" their "personal assistants consistently and on time" their PAs may quit, and "[i]f [their] personal assistants quit," they would likely be unable to find new assistants quickly, and "[i]f . . . [they] cannot find replacements" they would need to "seek care from a nursing facility or hospital." ECF No. 8 ¶¶ 10-12 (Wegman); *see also* ECF No. 9 ¶¶ 16-18 (Rodriguez); ECF No. 10 ¶¶ 14-16 (Spencer). That is far from clear and convincing evidence of an actual or imminent injury.

Furthermore, Plaintiffs' delay in seeking a preliminary injunction indicates "'at least a reduced need for such drastic speedy action'" and "'may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.'" *Shady v. Tyson*, 5 F. Supp. 2d 102, 109 (E.D.N.Y. 1998) (quoting *Costello v. McEnery*, 767 F. Supp 72, 78 (S.D.N.Y. 1991)). The CDPAP Amendment was enacted on April 20, 2024 (¶ 54). Plaintiffs did not move for preliminary injunctive relief until January 21, 2025, over nine months later. ECF No. 5. Regrettably, Plaintiffs' PI Motion appears to have been prompted by the FI industry's misinformation campaign. Still, Plaintiffs' delay in seeking relief should "bolster [the] conclusion that there has been an insufficient showing of irreparable harm to justify the issuance of a preliminary injunction." *Costello*, 767 F. Supp. at 75; *see also Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995) (four month delay supported denial of PI).

Additionally, as detailed in the Bassiri Declaration and PPL Declaration, the status of the transition and PPL's qualifications to achieve it confirm that Plaintiffs' speculations about the possible loss or reduction of CDPAP services are remote and unlikely to materialize. Plaintiffs' speculation that PAs would not be paid due to the absence of PPL/MCO contracts – triggering a chain of hypotheticals that might lead to institutionalization – is unjustified. PPL Decl. ¶ 3. And Plaintiffs' speculation that PPL would not offer hourly wages exceeding the New York City minimum wage was proven wrong. PPL Decl. ¶ 5. Plaintiffs fail to support a claim of irreparable harm, so the Court should not enjoin the continued implementation of the CDPAP Amendment.

### B.  The Balancing of the Equities Favors Defendant

A party seeking a preliminary injunction must show the "public interest" and the "balance of equities" weighs in favor of granting the injunction. *We The Patriots USA*, 17 F.4th at 279-80. Where, as here, the government is a party to the suit, these final two factors merge. *Id.* at 295.

The equities and public interest here weigh in favor of denying an injunction. CDPAP comprises around $9 billion of the Medicaid budget. *See* Bassiri Decl. ¶ 18. However, a substantial portion of CDPAP funding is not going to actual home care services, but instead is funneled to these FIs to cover administrative costs. *Id.* ¶¶ 19-20. The State estimates that transitioning to a single Statewide FI will reduce administrative costs by $500 million this upcoming fiscal year, without impacting funding for delivering actual personal care services. *Id.* ¶¶ 22, 88-93; Bassiri Decl., Ex. A at 35. Extrapolating that amount forward, the transition will free up billions of dollars to continue to provide medical services to needy beneficiaries. *See id.* at 35, 113. Accordingly, an injunction would weigh against the public interest of maintaining quality health services to Medicaid recipients. *See We the Patriots USA*, 17 F.4th 295-96 (public interest weighed against injunction preventing enforcement of COVID-19 vaccine mandate).

Further, Plaintiffs waited until the eleventh hour to move for a preliminary injunction, the granting of which would cause maximum chaos in the transition plan. But the public interest in a smooth transition to a more efficient CDPAP program greatly outweighs Plaintiffs' alleged harm, much of which is remote and speculative, and some of which may be self-inflicted if they have opted not to begin transitioning to the Statewide FI despite knowing about the impending transition. Delays at this point will prevent the transition to the Statewide FI by April 1, 2025, causing confusion, waste, and undue delay.

### C. Six Other Courts Have Denied Similar Motions to Enjoin the CDPAP Amendment's Implementation

Several state and federal courts already have denied preliminary injunction motions or temporary restraining orders challenging the CDPAP Amendment on similar grounds as Plaintiffs challenge it here. This Court also should deny the PI Motion.

As recently as January 31, 2025, three New York state courts have denied requests for temporary restraining orders in actions challenging the CDPAP Amendment implementation. *See* Michael Decl., Ex. A (Order to Show Cause, *Matter of Eckert v. McDonald*, Index No. 94315 (Sup. Ct. Cattaraugus Cnty. Jan. 31, 2025)); Ex. B (Order to Show Cause, *Matter of A&J Staffing, Inc. v. McDonald*, Index No. 912368-24 (Sup. Ct. Albany Cnty. Dec. 19, 2024)); Ex. C (Order to Show Cause, *Matter of Freedom Care LLC v. N.Y.S. Dep't of Health*, Index No. 161036/2024 (Sup. Ct. N.Y. Cnty. Nov. 27, 2024)). Like those courts, this Court should credit Defendant's contention that Plaintiffs do not suffer imminent risk of losing their CDPAP services absent an injunction. Indeed, the only court to grant a TRO in a CDPAP Amendment challenge to date enjoined only the imposition by DOH of any sanctions or penalties against a non-complying FI, and not the implementation of the CDPAP Amendment itself. *See* Michael

Decl., Ex. D (Order to Show Cause, *Matter of Caring Professionals, Inc. v. N.Y.S. Dep't of Health*, Index No. 601181/2025 (Sup. Ct. Nassau Cnty. Jan. 27, 2025)).

The *Jeannot* Court's dismissal of the complaint and denial of preliminary injunction relief is especially instructive here. *See Jeannot*, 2025 WL 80689 (E.D.N.Y. Jan. 13, 2025). The Court dismissed the preliminary injunction motion there as moot after finding that plaintiff consumers lacked standing to assert the same claims under the Medicaid Act, the ADA, and the Rehabilitation Act. *Id.* at *15 ("district courts '*cannot* consider the merits of [a] preliminary injunction motion and should dismiss [a] claim altogether' if they determine that a plaintiff's legal theory 'doom[s] the plaintiff's standing.'") (quoting *Do No Harm v. Pfizer Inc.,* No. 23-15, 2025 WL 63404, at *8 (2d Cir. Jan. 10, 2025) (emphasis and alterations in original)).

Similarly, in one of the first challenges to the CDPAP Amendment, a state court denied a preliminary injunction motion, finding that petitioners were unlikely to succeed on the merits of their claims because, *inter alia*, there is a rational basis for the CDPAP Amendment and thus it did not violate the Substantive Due Process Clause. *See* Michael Decl., Ex. E (Decision and Order, *Matter of Corning Council for Assistance and Information for the Disabled, Inc. v. McDonald*, Index No. 908147-24 (Sup. Ct. Albany Cnty. Sept. 30, 2024)). The Third Department then denied petitioners' motion for an injunction pending appeal. *See* Michael Decl., Ex. F (Decision and Order, Index No. CV-24-1693 (3d Dep't Nov. 21, 2024)). And last week, on February 7, the court in *Save Our Consumer Directed Home Care Program, Inc.* rejected an effort by a group of FIs to preliminarily enjoin the Statewide FI implementation, finding that none of the *twenty* arguments advanced by the FIs had demonstrated a likelihood of success on the merits under the SSL, the ADA, the Fourteenth Amendment, or various other statutes and doctrines. *See* Michael Decl., Ex. G , at 13-15, 28.

Defendant respectfully requests that this Court, like its sister court and state counterparts, deny Plaintiffs' motion for a preliminary injunction.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss the Complaint should be granted in its entirety and the Plaintiffs' PI Motion should be denied in full, together with such other relief as the Court may award.

Dated:  New York, New York
        February 10, 2025

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendant*

By:    /s/_____
       Vivian Costandy Michael
       Christina S. Parker
       Assistant Attorneys General
       28 Liberty Street
       New York, New York 10005
       Tel: (212) 416-8658
       Vivian.Michael@ag.ny.gov
       Christina.Parker@ag.ny.gov

## **WORD COUNT CERTIFICATION**

The undersigned hereby certify that  the Memorandum of Law in Opposition to

Plaintiffs' Preliminary Injunction Motion and in Support of Defendant's Motion to Dismiss the

Complaint complies with Rule 7.1(c) of the Local Rules of the United States District Courts for

the Southern and Eastern Districts of New York because the Court granted Defendant's request

to submit a memorandum up to 45 pages, the memorandum is less than 45 pages, and each

additional page does not contain more than 350 additional words, counted using Microsoft

Word's word count feature.


Dated:  New York, New York
        February 10, 2025

                                        LETITIA JAMES
                                        Attorney General
                                        State of New York
                                        *Attorney for Defendant*

                              By:    /s/_____
                                        Vivian Costandy Michael
                                        Christina S. Parker
                                        Assistant Attorneys General