USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/24/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MEDICAID CONSUMERS FOR
CONTINUITY OF CARE, ANN WEGMAN,
CARMEN RODRIGUEZ, AND MELISSA
SPENCER,

                    Plaintiffs,

             -against-

JAMES V. MCDONALD in his capacity as
the Commissioner of the New York State
Department of Health,

                 Defendant.

1:25-cv-00565 (MKV)

**OPINION & ORDER GRANTING
MOTION TO DISMISS & DENYING
MOTION FOR PRELIMINARY
INJUNCTION**

MARY KAY VYSKOCIL, United States District Judge:

    Plaintiffs Medicaid Consumers for Continuity of Care ("MCCC"), Ann Wegman, Carmen

Rodriguez, and Melissa Spencer bring this action against James V. McDonald in his capacity as

the Commissioner of the New York State Department of Health ("NYS DOH ") asserting claims

under the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), the Rehabilitation Act,

29 U.S.C. §§ 701 *et seq.*, the Medicaid Act, 42 U.S.C.§ 1396a(a), Title VI of the Civil Rights Act

of 1964, 42 U.S.C. § 2000d ("Title VI"), and the Fourteenth Amendment of the U.S. Constitution

alleging violations of Title 42, Section 1983 of the United States Code ("Section 1983"). [ECF

No. 1 ("Compl.")].

    Plaintiffs moved for a preliminary injunction to suspend and enjoin provisions of the

challenged April 2024 amendment to Section 365-f of the New York Social Services Law (the

"CDPAP Amendment") pending the resolution of the instant suit.  [ECF No. 5]. McDonald

opposed the motion for preliminary injunction and cross-moved to dismiss Plaintiffs' claims.

[ECF No. 26].  For the reasons set forth below, the motion to dismiss is GRANTED and the motion for preliminary injunction is DENIED.

## FACTUAL BACKGROUND[1]

### I.    The CDPAP Amendment

The Consumer Directed Personal Assistance Program ("CDPAP") is a New York Medicaid program through which Medicaid beneficiaries (or "consumers") who require home care can recruit and hire their own Personal Assistants ("PAs") to provide such care. Compl. ¶¶ 3, 28; N.Y. Soc. Serv. Law § 365-f; 18 N.Y.C.R.R. § 505.28.  Pursuant to CDPAP, consumers also hire Fiscal Intermediaries ("FIs") to assist with administrative tasks involved in employing PAs. Compl. ¶ 5. FIs onboard PAs, keep track of their time, bill Medicaid insurance companies for PA services, collect Medicaid reimbursement, and pay PAs' wages and benefits.  *Id.* There are currently approximately 280,000 consumers and 600 FIs in the state.  *Id.* ¶¶ 6, 8.  The NYS DOH is responsible for implementing CDPAP.  *Id.* ¶ 9.

Pursuant to a provision in the New York State Budget for State Fiscal Year 2024–25, New York's CDPAP will transition to a single, statewide FI (the "CDPAP Amendment") (the "CDPAP Amendment").  Compl. ¶¶ 7, 54.  The CDPAP Amendment states that "[e]xcept for the statewide fiscal intermediary and its subcontractors, as of April [1, 2025], no entity shall provide, directly or through contract, fiscal intermediary services."  *Id.* ¶ 56; N.Y. Soc. Serv. § 365-f (4-a-1)(a). Consumers and their PAs are required to enroll with the statewide FI before PAs may be paid for their services.  Compl. ¶¶ 99–100, 112.

### II.    The Parties & Public Partnerships, LLC

---

[1] The facts are taken from the Complaint [ECF No. 1 ("Compl.")], as well as "evidence from outside the pleadings" which the Court may consider on a motion to dismiss under Rule 12(b)(1).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir. 2024), *cert. denied*, —U.S.—, 145 S. Ct. 381, 220 L. Ed. 2d 144 (2024).

Defendant James McDonald is the Commissioner of the NYS DOH and is responsible for the administration, enforcement, and implementation of the CDPAP Amendment. *Id.* ¶ 22. Public Partnerships, LLC ("PPL") was hired to function as the statewide FI. *Id.* ¶ 8. Over thirty FIs have subcontracted with PPL to continue providing FI services. Def. Reply at 4; Perrin Decl. ¶ 62; Bassiri Decl. ¶ 41. At the time of briefing, PPL was considering subcontracting with another 20 FIs. Perrin Decl. ¶ 62.

Plaintiffs Ann Wegman and Melissa Spencer are consumers who receive at home care from PAs under CDPAP. *Id.* ¶¶ 19–20. Matilde Loarte is a consumer who suffers from dementia and receives at home care from PAs under CDPAP. *Id.* ¶ 21. Plaintiff Carmen Rodriguez is Loarte's daughter and her "CDPAP designated representative." *Id.* ¶ 21. Plaintiff MCCC is a member organization consisting of consumers, which was formed in response to the CDPAP Amendment. Compl. ¶¶ 13, 18-21, 23. Rose Jones is a CDPAP consumer and a member of MCCC. Jones Decl. ¶¶ 2, 13–14. The president of MCCC, Ken Sternfeld, is also a CDPAP consumer. Sternfeld Decl. ¶¶ 2, 5, 11.

Plaintiffs allege that CDPAP consumers will be injured by the CDPAP Amendment. Compl. ¶¶ 114, 162, 224; Wegman Decl. ¶¶ 5, 8; Spencer Decl. ¶¶ 5, 8, 14; Rodriguez Decl. ¶¶ 6, 16–18; Jones Decl. ¶¶ 13–14; Sternfeld Decl. ¶¶ 2, 5, 11. The Plaintiffs allege that they and their PAs may fail to enroll before the designated deadline, and thus their PAs will go unpaid for their services, or PPL will pay PAs less than they are currently paid or be unable to pay PAs at all. Compl. ¶¶ 114, 120–122, 127, 142, 162. Plaintiffs state that "if personal assistants are not reliably paid in full and on time, they will not be able to continue in their role as personal assistants and consumers will suffer a loss in care and risk having to be institutionalized." Sternfeld Decl. ¶ 10; Compl. ¶¶ 162, 165. For instance, Plaintiff Wegman states that "if PPL fails to pay my personal

assistants consistently and on time, it will force them to seek employment elsewhere." Wegman Decl. ¶¶ 10. Wegman goes on to state that "[i]f my personal assistants quit it is highly unlikely that I will be able to find acceptable new assistants in time to avoid a lapse in care" and "[i]f I do not have in home support, I would need to seek care from a nursing facility or hospital." *Id.* ¶ 12. The other plaintiffs and MCCC members make similar allegations. *See* Rodriguez Decl. ¶¶16–18; Spencer Decl. ¶ 8, 14–17; Jones Decl. 11, 13–14. Plaintiffs also allege that the CDPAP Amendment will cause them to lose their preferred FI. Compl. ¶¶ 149–50.

Many consumers are unaware of the requirement to register with PPL. Compl. ¶ 114. The three individual plaintiffs and Rose Jones attest that they were unaware of the mandatory transition to PPL until they were contacted by an advocate to discuss suing to stop the CDPAP Amendment. Pl. Reply at 20 (citing Wegman Decl. ¶ 9; Rodriguez Decl. ¶ 14; Spencer Decl. ¶ 13; Jones Decl. ¶ 10). The President of MCCC attests that "many, many people in New York State do not know what is happening" and attests he knows of at least five consumers who are unaware of the CDPAP transition, but confirms that none of these consumers are MCCC members. Sternfeld Decl. ¶¶ 6, 16. However, Ms. Rodriguez did receive some outreach notifying her of the CDPAP Amendment and transition. Rodriguez Decl. ¶ 13; Rodriguez Reply Decl. ¶¶ 4–7. Specifically, she received three emails regarding the transition to the statewide FI and an automated call from PPL that stated she would receive a call from an enrollment specialist. Rodriguez Decl. ¶ 13; Rodriguez Reply Decl. ¶¶ 4–7. She did not receive such a call. Rodriguez Reply Decl. ¶ 7.

Plaintiffs assert that the rate of consumer enrollment with PPL is "abysmal." Compl. ¶ 110. The President of PPL, on the other hand, attests that PPL is "on track" to enroll all consumers by the cutoff date. Perrin Decl. ¶¶ 89–90. Plaintiff Spencer and non-party Sternfeld, President of MCCC, have enrolled with PPL. Spencer Reply Decl. ¶ 4; Sternfeld Suppl. Decl. ¶ 3. A week

before the April deadline, Sternfeld attested that his two PAs had not "been able" to enroll. Sternfeld Suppl. Decl. ¶ 3.  Sternfeld states that he watched one of his PAs sit on the phone with a PPL representative for an hour while attempting to enroll.  *Id.* ¶ 4.  Mr. Sternfeld also attests that before he enrolled, he spent an hour on the phone with a PPL representative, who was unable to answer his questions, and did not return his call despite a promise to do so.  Sternfeld Reply Decl. ¶ 9.

Finally, Plaintiff Wegman attests that she attempted to enroll but does not know whether she has been enrolled.  Wegman Suppl. Decl. ¶¶ 4-5.  She states that she "experienced great difficulty" completing the registration process, experienced long wait times, and was once told to "shut up" by an enrollment specialist.  *Id.*  One of Wegman's PAs, who cares for her on the weekends, filed an affidavit stating that he attempted to enroll several times but was unable to do so because the "enrollment system will not recognize Ms. Wegman's PPL ID number."  Wegman Decl. ¶ 6; Williams Suppl. Decl ¶ 3.

Plaintiffs are concerned that PPL will cut their PAs' pay.  Compl. ¶¶ 120–27.  PPL sent offer letters to PAs who work for CDPAP consumers in New York City offering $19.10 per hour, which is minimum wage for a home care aide in New York City.  Compl. ¶ 127; N.Y. Pub. Health Law § 3614-f(2)(c)(i).  Some PAs in New York currently earn minimum wage and many also earn above minimum wage.  Compl. ¶ 127.  The Complaint alleges that "[i]t is clear that PPL will be paying minimum wage throughout the state" and PAs currently earning above minimum wage "can expect a pay cut from PPL."  *Id.*

Plaintiffs are also concerned that PPL will be unable to pay their PAs.  Compl. ¶¶ 120–26. Plaintiffs allege that a statewide FI *must* have $800 million in reserve to be able to make payments to the numerous PAs across New York because it "typically" takes Medicaid insurers, or Medicaid

Managed Care Organizations ("MMCOs"), about 45 days to process reimbursement with Medicaid funds, while payments to PAs are made weekly or bi-weekly. Compl. ¶¶ 72, 120. The monthly CDPAP payroll is approximately $750 million and PPL has secured only $100 million line of credit for payment of PAs. Perrin Decl. ¶¶ 27, 32. However, as of February 27, 2025, PPL entered into contracts with 33 of the 34 MMCOs, which cover all but approximately four hundred CDPAP consumers, Perrin Reply Decl. ¶¶ 3–4, and eight of the largest MMCOs have agreed to advance funds to PPL each week to cover the costs for PAs providing care to enrolled consumers. *Id.* ¶ 10.

### III.    Related Litigation

Several lawsuits have been filed by consumers and fiscal intermediaries attempting to block the CDPAP Amendment scheduled to go into effect April 1, 2025. *See, e.g.*, *Glidedowan, LLC v. New York State Dep't of Health*, No. 6:24-CV-06731 EAW, 2025 WL 669510, at *14 (W.D.N.Y. Mar. 3, 2025); *Principle Homecare, LLC v. McDonald*, No. 24-CV-07071 (MMG), 2025 WL 622876, at *17 (S.D.N.Y. Feb. 26, 2025); *Jeannot v. New York State*, No. 24-CV-05896 (HG), 2025 WL 80689, at *15 (E.D.N.Y. Jan. 13, 2025). Several courts have denied Plaintiffs' preliminary injunctions or dismissed the case entirely. *See Glidedowan, LLC*, 2025 WL 669510, at *14; *Principle Homecare, LLC*, 2025 WL 622876, at *17; *Jeannot*, 2025 WL 80689, at *15 (E.D.N.Y. Jan. 13, 2025). However, one day before the CDPAP Amendment was scheduled to go into effect, one District Court issued a Temporary Restraining Order requiring NYS DOH to allow all FIs to continue servicing CDPAP consumers who have not yet registered with PPL. *See Engesser v. McDonald*, No. 25-cv-01689-FV-LKE (E.D.N.Y. March 31, 2025) [ECF No. 37]. On April 10, 2025, the same Court subsequently entered a joint stipulated preliminary injunction which requires NYS DOH to ensure that PAs working with consumers as of March 31, 2025 will

continue to be timely paid for their services whether or not they or the consumers they serve are fully enrolled with PPL. *See Engesser*, No. 25-cv-01689-FV-LKE (E.D.N.Y. April 10, 2025) [ECF No. 62]. Pursuant to the stipulated injunction, PAs will either be paid by their prior FIs while they and the consumers they serve are registered or they will be helped through an expedited enrollment process. *Id.* §§ II.d.ii, II.e.ii. To expedite onboarding, NYS DOH will expand its CDPAP transition team, establish a dedicated phone line, visit consumer's homes, and allow in-office visits, among other strategies to help consumers. *Id.* § XX. The new deadline for consumers to register is May 15, 2025. *Id.* §§ I.k, II.e.vi. The Preliminary Injunction will continue through June 6, 2025, at which time PAs must be fully registered. *Id.* §§ I.h, II.e.vi. However, NYS DOH stated that it "will not oppose any request for a reasonable extension of the Expiration Date that is based on PPL's administrative capacity to timely register Consumers." *Id.* § IV.c.

## PROCEDURAL HISTORY

Plaintiffs initiated this action by filing a complaint alleging that McDonald's implementation of the CDPAP Amendment violates several laws. [ECF No. 1 ("Compl.")]. The Complaint asserts six claims:

- Violation of the ADA 42 U.S.C. § 12132 and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* ("Count One");
- Violation of the Free Choice Provider Provision of the Medicaid Act, 42 U.S.C.§ 1396a(a)(23) ("Count Two");
- Violation of the Reasonable Promptness Provision of the Medicaid Act, 42 U.S.C.§ 1396a(a)(8) ("Count Three");
- Violation of the Comparability Provision of the Medicaid Act, 42 U.S.C.§ 1396a(a)(10)(B) ("Count Four");
- Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI") ("Count Five");
- Violation of 42 U.S.C. § 1983 based on alleged violations of due process rights under the Fourteenth Amendment of the U.S. Constitution ("Count Six").

Contemporaneous with the filing of the Complaint, Plaintiffs moved for a preliminary injunction to suspend and enjoin the CDPAP Amendment pending the resolution of this dispute

and specifically stop the CDPAP Amendment provisions that prevented FIs from providing services to consumers from taking effect March 31, 2025. [ECF No. 5]. Plaintiffs filed a memorandum and several declarations in support of their motion. [ECF Nos. 6 ("Pl. Mem."), 7 ("Sternfeld Decl."), 8 ("Wegman Decl."), 9 ("Rodriguez Decl."), 10 ("Spencer Decl."), 11 ("Jones Decl."), 12 ("Serrano Decl."), 13 ("Matthias Decl."), 14 ("Cowart Decl."), 15 ("Williams Decl."), 16 ("Holler Decl."), 17 ("Cohen Decl.")]. McDonald opposed the motion for preliminary injunction and cross-moved to dismiss Plaintiffs' claims, filing a single memorandum opposition to injunctive relief and in support of the motion to dismiss, as well as several declarations and attached exhibits. [ECF Nos. 26, 27 ("Def. Mem."), 28 ("Bassiri Decl."), 29, 30 ("Perrin Decl.")]. Plaintiffs filed a reply in further support of their motion for preliminary injunction and an opposition to the motion to dismiss, as well as several declarations, some of which included attached exhibits. [ECF Nos. 33 ("Pl. Reply"), 34 ("Sternfeld Reply Decl."), 35 ("Wegman Reply Decl."), 36 ("Rodriguez Reply Decl."), 37 ("Spencer Reply Decl."), 38 ("Jones Reply Decl."), 39 ("Cohen Decl.")]). McDonald filed a reply in further support of his motion to dismiss as well as a declaration and an affidavit attaching several exhibits. [ECF No. 42 ("Def. Reply"), 43, 44 ("Perrin Reply Decl.")]. The parties filed several subsequent letters and three supplemental declarations. [ECF Nos. 47–49, 50, 50–4 ("Wegman Suppl. Decl."), 50–5 ("Williams Suppl. Decl."), 50–6 ("Sternfeld Suppl. Decl."), 51, 52]. Plaintiffs also filed a letter motion requesting leave to file two additional exhibits in support of their motion for a preliminary injunction and in opposition to Defendant's motion to dismiss the Complaint. [ECF No. 46 ("Pl. Letter Mot.")].

## LEGAL STANDARDS

A district court "properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,'

such as when. . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). To satisfy the "'irreducible constitutional minimum' of standing," a plaintiff must demonstrate (1) "invasion of a legally protected interest" that is "actual and imminent, not conjectural or hypothetical" and "concrete and particularized," also known as an injury-in-fact, (2) that is "fairly traceable" to the defendant's challenged action, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016); *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)). A threatened injury is imminent when it is "certainly impending" and "allegations of possible future injury" are insufficient to establish injury-in-fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

In addition, a federal district court is authorized to decide on actual "cases or controversies." *See, e.g.*, *In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010). This limitation on the Court's power to adjudicate disputes means that a cause of action must be ripe—it must present "a real, substantial controversy, not a mere hypothetical question." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993)). "Ripeness 'is peculiarly a question of timing.'" *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). "A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* (quoting *Thomas*, 473 U.S. at 580–81). Courts may "consider the parties' constitutional standing and constitutional ripeness challenges together" because the ripeness and standing doctrines overlap in the requirement that injury alleged must be "actual and imminent."

*See Nat'l Org. for Marriage, Inc.*, 714 F.3d at 688–89 & n.6.

In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may consider affidavits and "evidence outside the pleadings," but it may not rely on conclusory or hearsay statements contained in affidavits. *Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir. 2024), *cert. denied*, —U.S.—, 145 S. Ct. 381, 220 L. Ed. 2d 144 (2024) (citing *Makarova*, 201 F.3d at 113 and citing *Cooke v. United States*, 918 F.3d 77, 80 (2d Cir. 2019)). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists, even at the motion to dismiss stage. *See Nouritajer v. Jaddou*, 18 F.4th 85, 88 (2d Cir. 2021) (citing *Makarova*, 201 F.3d at 113).

When seeking a preliminary injunction, a plaintiff's burden to establish standing "will normally be no less than that required on a motion for summary judgment." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)). To establish standing for a preliminary injunction, "a plaintiff cannot rest on such mere allegations, as would be appropriate at the pleading stage, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)) (internal quotation marks and brackets omitted).

## DISCUSSION

Any controversy between the parties in this case is contingent on the future possibility that PPL will be unable to pay Plaintiffs' PAs for various reasons or unwilling to pay them their current rates, those PAs will consequently stop working for Plaintiffs, Plaintiffs will be unable to hire new PAs to replace them, and Plaintiffs will thus be institutionalized or be injured by gaps in their healthcare. Plaintiffs' theory of injury is highly attenuated and based on several "contingent future

events that may not occur as anticipated, or indeed may not occur at all.'" *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 687. As such, Plaintiffs lack standing, their claims are not ripe, and the Court lacks subject matter jurisdiction over this case.

Individual plaintiffs Ann Wegman and Melissa Spencer allege injuries on their own behalf. Compl. ¶¶ 19–20. Carmen Rodriguez brings claims on behalf of her mother, Maltilde Loarte who receives CDPAP services and suffers from dementia. *Id.* ¶ 21.[2]

The remaining plaintiff, MCCC, may have Article III standing as an organization in one of two ways: (1) it may have associational standing to sue on behalf of its members if one member of the organization has standing, or (2) the organization may have standing to sue on its own behalf to seek judicial relief from injury to itself. *See NY Civil Liberties Union v. NYC Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2014 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975). MCCC does not expressly invoke associational standing, but it asserts injuries only on behalf of its members, not on behalf of itself. Compl. ¶¶ 18, 52; Pl. Opp. at 13–22. Thus, the Court construes MCCC's claims as alleging that it has associational standing. A Plaintiff claiming associational standing is required "to identify members who have suffered the requisite harm." *Summers*, 555 U.S. at 499. The Second Circuit has held that, though an organization need not "name names" to identify members, it must at least "allege facts that affirmatively and plausibly suggest that it has standing to sue." *Fac. v. New York Univ.*, 11 F.4th 68, 76 (2d Cir. 2021). According to their several declarations each individual plaintiff and a CDPAP consumer named Rose Jones are members of

---

[2] A plaintiff seeking third-party standing must demonstrate a close relationship to the injured third party and "a hindrance to that party's ability to protect its own interests." *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005); *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974 KMK, 2015 WL 5729969, at *48 (S.D.N.Y. Sept. 30, 2015). Though Plaintiffs make no express argument regarding third-party standing, Rodriguez arguably satisfies her burden by attesting that Loarte has dementia and is "unable to perform basic functions of daily living without assistance" and that Rodriguez is her daughter who is involved in managing her care. Rodriguez Decl. ¶¶2, 3, 7, 13, 14.

MCCC and they all allege that they will be injured by the CDPAP Amendment.  Wegman Decl. ¶¶ 5, 8, Spencer Decl. ¶¶ 5, 8, 14, Rodriguez Decl. ¶¶ 6, 16–18,[3] Jones Decl. ¶¶5, 13–14.  The president of MCCC Ken Sternfeld also is a CDPAP consumer and he also attests that he will be injured by the CDPAP Amendment. Sternfeld Decl. ¶¶ 2, 5, 11. Though he does not assert that he is a member of MCCC, the Court assumes for the purpose of argument that his role as president grants him membership in the organization.

Defendant argues that Plaintiffs and MCCC members do not have standing and their claims are not ripe because they do not plead a concrete injury-in-fact, traceable to the Defendant's challenged action and the only injuries they allege are "remote and speculative."  Def. Mem. at 18–20, 26–28.  The Court agrees.

## A.    The Injuries Asserted Are Not Particularized, Concrete or Certainly Impending

Plaintiffs assert that they have adequately alleged two injuries-in-fact. First, Plaintiffs contend that they will lose their choice of FI, which Plaintiffs assert is a statutorily protected right, *see* Pl. Opp. at 13, Compl. ¶¶ 149–50.  Second, they contend that PPL's disorganization and potential inability to pay PAs will cause Plaintiffs' PAs to quit, and as a result Plaintiffs will face the "increased likelihood" of being institutionalized or face "significant risk of death, severe medical crisis, or severe injury."  Compl. ¶¶ 114, 142, 162; Pl. Reply at 17.  Neither contention establishes Article III standing or ripeness.

A similar case in the Eastern District of New York, *Jeannot v. New York State*, found that consumer plaintiffs attempting to block the CDPAP Amendment had no standing.  *See* No. 24-CV-05896 (HG), 2025 WL 80689, *8 (E.D.N.Y. Jan. 13, 2025).  Similar to Plaintiffs here,

---

[3] As mentioned, Rodriguez appears to allege an injury to her mother, not herself. Plaintiffs have not argued that Rodriguez's membership can create standing for MCCC.

consumer plaintiffs in *Jeannot* argued that they had standing (1) because they lost their asserted statutory right to choose an FI and (2) because their PAs may not transition to the statewide FI or the statewide FI may not provide services with the same quality as the plaintiffs' current FIs, which may cause plaintiffs to receive diminished CDPAP services. *Id.* at *5–*6. As explained further below, this Court agrees with the *Jeannot* conclusion that Plaintiffs' alleged injuries are too speculative to confer standing. *See* 2025 WL 80689, at *6. Moreover, the recently stipulated preliminary injunction in *Engesser*, makes Plaintiffs' lack of standing crystal clear. *See* No. 25-cv-01689-FV-LKE (E.D.N.Y. April 10, 2025) [ECF No. 62].

### i.    Loss of Preferred FI

Plaintiffs fail to establish standing by a preponderance of the evidence based on the allegation that they will lose their choice of FI.  Plaintiffs must demonstrate a "concrete" injury which "actually exist[s]" and is "real" not "abstract." *Spokeo*, 578 U.S. at 340. Plaintiffs argue that the loss of their choice of FI creates a concrete harm because under the Freedom of Choice provision of the Medicaid Act—under which Plaintiffs bring one claim—Plaintiffs have the right to their choice of FI.  Pl. Reply at 13 (citing 42 U.S.C. § 1396a(a)(23)). This argument is flawed in three respects.

First, Plaintiffs have not established that they will lose their preferred FIs.  As the Complaint concedes, under the CDPAP Amendment, FIs who contract with the PPL may continue to provide FI services for their clients.  Compl. ¶ 56.  Over thirty FIs have subcontracted with PPL.  Def. Reply at 4; Perrin Decl. ¶ 62; Bassiri Decl. ¶ 41.  At the time of briefing, PPL was considering contracting with another 20 FIs.  Perrin Decl. ¶ 62.  Plaintiffs have not established with particularity they will be injured because their FI will not be permitted to continue providing them services.  *See Defs. of Wildlife*, 504 U.S. at 561 n.1 (a "particularized" injury "must affect the

plaintiff in a personal and individual way"). They have not identified their FIs or affirmed that their FIs have not subcontracted with PPL.

Second, the Medicaid Act provides no statutory right to consumer's choice of FI.  The Freedom of Choice Provision of the Medicaid Act states that "any individual eligible for *medical assistance*," "may obtain *such assistance* from any institution, agency, community pharmacy, or person qualified to perform the service or services required[,] . . . who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23) (emphasis added).  This provision grants consumers the right to choose the provider of "medical assistance."  *Id.*  As Defendants point out, the Medicaid Act enumerates the types of care and services that constitute "medical assistance," which include inpatient hospital services, laboratory and X-ray services, physicians' services, personal care services, and home health care services. *See* Def. Reply at 29 (citing 42 U.S.C. § 1396d(a)(1)-(32)).  Each item in the list is a form of healthcare. *See Williams ex rel. United Guardianship Servs. v. Shah*, No. 12-CV-3953 RRM RML, 2014 WL 1311154, at *7 (E.D.N.Y. Mar. 30, 2014), *aff'd on other grounds sub nom. Backer ex rel. Freedman v. Shah*, 788 F.3d 341 (2d Cir. 2015) ("Section 1396d(a) provides a definition of 'medical assistance' that lists medical services—including certain 'nursing facility services'—that are covered or partially covered under Medicaid.").  FIs do not provide healthcare to consumers.  Instead, they do administrative work—they onboard the PAs who provide the medical assistance, keep track of their time, bill Medicaid insurance companies for PA services, collect Medicaid reimbursement, and pay PAs' wages and benefits. Compl. ¶ 5.  As the *Jeannott* Court found, FIs do not provide medical assistance merely because they "facilitate" the provision of medical assistance with their administrative work. *Jeannot*, No. 24-CV-05896 (HG), 2025 WL 80689, at *13 (E.D.N.Y. Jan. 13, 2025) (citing *Williams*, 2014 WL 1311154, at *7 (finding that a legal guardian did not provide "medical assistance" under the

Medicaid act even though he or she "may assist with securing nursing facility services.")).

Plaintiffs argue that FIs provide personal care services and home care services for two reasons Pl. Reply. at 30.  Both arguments are unavailing. First, Plaintiffs argue they have a right to choose their FI because FIs provide services similar to a licensed home care services agency ("LHCSA"), which provide home care in New York, and Plaintiffs claim—without any support— that "Medicaid beneficiaries are entitled to their choice of LHCSA pursuant to the choice of provider statute." Pl. Reply at 30–32.  However, as defined in the New York Public Health Law, an LHCSA is a licensed "organization primarily engaged in arranging and/or providing . . . Nursing services, home health aide services, and other therapeutic and related services . . . ." N.Y. Pub. Health L. § 3602 (McKinney); *see also* N.Y. Pub. Health L. § 3605-b (LHCSAs "provide nursing services, home health aide services, or personal care services").  However, as explained, FIs do not provide similar medical services.

Next, Plaintiffs argue that they have a right to choose their FI because FIs are defined as Medicaid "providers" under New York State's Medicaid Guidelines and FIs have Medicaid provider IDs. Pl. Reply at 31–32 (citing Compl. ¶ 149 (conclusorily "stating that a Fiscal Intermediary is a 'provider' under the Medicaid Act")).  This argument is inapposite because it fails to show how FIs provide "medical assistance" as defined in the Medicaid Act.  Accordingly, on a plain reading of the Medicaid Act, consumers have no statutory right to choose their preferred FI.

Third, even if there were a statutory right to choose an FI, the Supreme Court has held that the violation of a statutory right does not "automatically" satisfy the Article III the injury-in-fact requirement.  *Spokeo*, 578 U.S. at 341.  Plaintiffs do not provide sufficient support for their assertion that the loss of their choice of FI creates a concrete harm, citing to only one out of circuit

15

case. Pl. Reply at 13–14 (citing *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019)). In that case, the Fourth Circuit held that denial of the right to select a "qualified provider" created a "tangible harm" because the plaintiff had "diminished access to high-quality health care suited to the individual plaintiff's needs." *Planned Parenthood S. Atl.*, 941 F.3d at 707. Here, Plaintiffs have not established that the loss of their preferred FI creates a tangible harm by impeding Plaintiffs' access to health care suited to the Plaintiffs' individual needs.

To determine whether a harm is concrete, courts "should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Plaintiffs' conclusory statements and opinions about the quality of the services that PPL *may* provide do not establish a "concrete harm." They opine that PPL is "not as good as their existing FI" based on two cited "bad experiences" with PPL. Pl. Reply at 14 (citing Compl. ¶¶ 80-131 and citing Rodriguez Reply Decl. ¶¶ 5-7 (Rodriguez received one automated call from PPL and did not receive a follow-up call with a specialist though the automated call said she should expect one) and citing Sternfeld Reply Decl. ¶ 9 (Sternfeld spent an hour on the phone with a PPL representative, who was unable to answer his questions, and did not return his call despite a promise to do so)). These anecdotal "bad experiences"—both issues communicating with PPL representatives and Plaintiffs' opinions regarding the quality of PPL's services—are conclusory and merely speculative "allegations of a possible future injury" and thus are insufficient to establish a concrete future injury that is "certainly impending." *Clapper*, 568 U.S. at 409. Similar to *Jeannot*, this Court finds that the harm Plaintiffs contend "will flow from the loss of their FI is

too speculative to satisfy [the concrete injury] requirement." *Jeannot*, 2025 WL 80689, at *8.

ii.    **Increased Likelihood of Institutionalization,
       Death, Medical Crisis, or Injury**

Next, Plaintiffs do not establish a particularized injury that is "certainly impending" when

they allege that they face an "increased likelihood" of being institutionalized or a "significant risk

of death, severe medical crisis, or severe injury" because their PAs may decide to quit their jobs

based on the possibility that (1) PPL will fail to enroll them before the designated deadline or (2)

PPL will pay PAs less or be unable to pay PAs at all.  Compl. ¶¶ 114, 120–122, 127, 142, 162; Pl.

Reply at 15–17.  Plaintiffs' expected injury is not certainly impending since they are entirely

dependent on "speculation about [PPL's] future actions" and the actions of several other parties.

*See Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 144 (2d Cir. 2021); *Nat'l Org. for

Marriage, Inc.*, 714 F.3d at 687 (finding that a claim is not ripe and does not allege an injury-in-

fact if it depends upon "contingent future events that may not occur as anticipated, or indeed may

not occur at all.").

In *Jeannot*, consumer plaintiffs argued that they would be injured by the CDPAP

Amendment because a Statewide FI *may not* be able to provide the same level of care and

attention—including language and cultural competence—that their current FIs provide and their

PAs *may* choose not to transition with them to the Statewide FI and if either of these potentialities

occurred, consumer plaintiffs *may* receive diminished CDPAP services.  *Jeannot*, 2025 WL 80689,

at *5.  The Court held that Plaintiffs claims were too speculative to establish an injury-in-fact

because, similar to the claims here, they rely on "on a series of events that may not actually occur."

*Id.* at *6 (citing *Clapper*, 568 U.S. at 411 (a "threatened injury must certainly be impending") and

citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (holding that injury anticipated to result

from government action was "too speculative or otherwise too attenuated to establish standing"

because it was "not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs")).

Moreover, similar to the plaintiffs in *Jeannot*, Plaintiffs here use "conditional or future-oriented terms" to assert that they will suffer injuries which further "undermine[s]" their contention that any alleged injury is actual and imminent. *Jeannot*, 2025 WL 80689, at *6 (quoting *Lacewell*, 999 F.3d at 144). For example, Plaintiffs state that "*if* personal assistants are not reliably paid in full and on time, they will not be able to continue in their role as personal assistants and consumers will suffer a loss in care and risk having to be institutionalized." Sternfeld Decl. ¶ 10 (emphasis added). Plaintiff Wegman states that "*if* PPL fails to pay my personal assistants consistently and on time, it will force them to seek employment elsewhere" and "*[i]f* my personal assistants quit it is highly unlikely that I will be able to find acceptable new assistants in time to avoid a lapse in care" and "*[i]f* I do not have in home support, I would need to seek care from a nursing facility or hospital." Wegman Decl. ¶¶ 10–12 (emphasis added). The other plaintiffs and MCCC members use similar conditional language. *See* Rodriguez Decl. ¶¶16–18; Spencer Decl. ¶ 8, 14–17; Jones Decl. 11, 13–14.

Plaintiffs argue that since the *Jeannot* lawsuit was filed, several events have transpired that create a stronger case for Plaintiffs' injury-in-fact. Pl. Reply at 15. Generally, Plaintiffs assert that now that PPL has been hired and time has passed, they have an actual injury-in-fact. *Id.* But the same attenuated theory of injury remains. The speculation that PPL will fail to function properly, which will cause PAs to quit, and Plaintiffs will be unable to replace them and that will cause Plaintiffs to face a lapse in care or institutionalization. Pl. Reply at 17–18. Plaintiffs' factual allegations that they assert arose since the *Jeannot* case was filed, do not cure the speculative

nature of Plaintiffs' claimed injuries.

First, Plaintiffs allege that NYS DOH hired PPL as the centralized statewide FI under "suspicious circumstances" and PPL is "an unqualified company." Pl. Reply at 15; Compl. ¶¶ 65-77. Plaintiffs support the contention that PPL is unqualified by alleging that PPL's prior administrative projects in other states were mismanaged. Compl. ¶¶ 81–97. Even if PPL mismanaged work in the past, it is highly speculative to infer from this that PPL will in the future inflict an injury-in-fact. *See Davis v. Kosinsky*, 217 F. Supp. 3d 706, 712 (S.D.N.Y. 2016) (dismissing claims here finding an injury-in-fact would require the Court to "engage in conjecture" and "assume" certain events would occur).

Next, Plaintiffs make much of the alleged failure of PPL and NYS DOH to properly notify patients potentially affected by the CDPAP Amendment. Compl. ¶¶ 9, 106–12; Reply at 16. Plaintiffs also complain that explanatory materials about the CDPAP are not provided in language other than English. Compl. ¶¶ 211–13. They assert that PPL and NYS DOH's lack of outreach will cause some consumers to be unaware of the transition to a statewide FI by the April 1, 2025 and will result in disruptions in their care. Compl. ¶¶ 112–14, 213; Pl. Mem at 6–7. Defendant argues, on the other hand, that PPL has engaged in "significant consumer outreach" and offered assistance in numerous languages, offering several examples. Def. Mem. at 19–20 (citing Perrin Decl. ¶¶ 46-52, 67-76, 92, 89). Plaintiffs argue that insufficient outreach by PPL creates an injury-in-fact for Plaintiffs because three Plaintiffs, and a member of the MCCC, all attest that they were unaware about the mandatory transition to PPL until they were contacted by an advocate to discuss suing to stop it. Pl. Reply at 20 (citing Wegman Decl. ¶ 9; Rodriguez Decl. ¶ 14; Spencer Decl. ¶ 13; Jones Decl. ¶ 10).

However, Plaintiffs' and MCCC members' declarations and participation in this lawsuit

clearly demonstrate that they *are* aware of the transition to the statewide FI and the need to enroll. Wegman Decl. ¶ 8; Rodriguez Decl. ¶ 12; Spencer Decl. ¶ 12; Jones Decl. ¶ 9; Sternfeld Decl. ¶ 11.  Indeed, Plaintiff Spencer and Sternfeld have enrolled with PPL. Spencer Reply Decl. ¶ 4; Sternfeld Suppl. Decl. ¶ 3.  Further, none of the Plaintiffs or MCCC members who have filed declarations in this case attest that they cannot speak or read English.  Def. Mem at 18, 25; Def. Reply at 4; *see, e.g.*, Wegman Decl., Spencer Decl., Jones Decl.  While the President of MCCC attests that some members of MCCC have limited English proficiency, and "many, many people in New York State do not know what is happening," he confirms that he knows of no MCCC members who are unaware of the need to enroll with PPL.  Sternfeld Decl. ¶ 16; Sternfeld Reply Decl. ¶¶ 3, 6.  Accordingly, Plaintiffs have not established any certainly impending injury resulting from PPL's purported lack of outreach or miscommunication that is particularized to them.

Moreover, pursuant to the Stipulated Preliminary Injunction, entered recently in the *Engesser* case, Plaintiffs now have even more time to enroll, their PAs will be paid while they enroll, and Plaintiffs will receive even more outreach to assist them with the enrollment process. *See Engesser*, No. 25-cv-01689-FV-LKE (E.D.N.Y. April 10, 2025) [ECF No. 62].  NYS DOH is required to conduct additional and intensive outreach to consumers in the meantime, by several means including increasing staff, establishing a dedicated phone line, visiting consumer's homes, and allowing in-office visits.  *Id.*  Moreover, the deadline to register with PPL has been pushed by more than a month for consumers and more than two months for PAs and NYS DOH "will not oppose any request for a reasonable extension" of these new deadlines to register.  *Id.*

Next, Plaintiffs assert that the rate of consumer enrollment with PPL is "abysmal." Compl. ¶ 110; Pl. Reply at 16–17.  Consumers and their PAs are required to enroll with PPL before PAs may be paid by the new statewide FI for their services.  Compl. ¶¶ 99–100, 112.  The President of

PPL attests that PPL is "on track" to enroll all consumers by the cutoff date. Perrin Decl. ¶¶ 89–90. Regardless, Plaintiffs cannot establish a harm particularized to them based on the lack of enrollment by other consumers. The Complaint makes no allegations that PPL or NYS DOH has prevented these Plaintiffs or MCCC members in particular from enrolling with PPL. *See* Compl. ¶¶ 98–114. Accordingly, Plaintiffs' argument based on lack of enrollment does not establish associational standing for MCCC. *See Fac. v. New York Univ.*, 11 F.4th at 76 (finding no associational standing where an association fails to demonstrate that its members have experienced an "invasion of a legally protected interest" that is "certainly impending" or that "there is a substantial risk that the harm will occur.").

Statements in subsequent affidavits regarding these Plaintiffs' and MCCC members' enrollment status do not establish by a preponderance of the evidence that the harm they expect to endure, namely gaps in healthcare and institutionalization, is "certainly impending" or traceable to Defendant's actions. First, Spencer and Sternfeld have already enrolled. Spencer Reply Decl. ¶ 4; Sternfeld Suppl. Decl. ¶ 3. There is no evidence in the record regarding whether Spencer's PAs have attempted enrollment. Spencer Decl.; Spencer Reply Decl.; Mattias Decl.; Cowart Decl.; Holder Decl. Sternfeld, on the other hand, states that his two PAs had not "been able" to enroll a week before the initial deadline, which has now been extended by the *Engesser* Stipulated Preliminary Injunction. Sternfeld Suppl. Decl. ¶ 3. Sternfeld states that he watched one of his PAs sit on the phone with a PPL representative for an hour while attempting to enroll. *Id.* ¶ 4.[4] This is hardly a concrete injury in fact.

Jones and Rodriguez have proffered no evidence regarding whether they and their PAs

---

[4] All other statements Sternfeld includes about the enrollment process for his PAs are inadmissible hearsay. *Id.* ¶ 4–5.

have attempted to enroll or whether enrollment was successful.  *See* Jones Decl.; Jones Reply Decl.; Rodriguez Decl.; Rodriguez Reply Decl.  Wegman attests that she attempted to enroll but does not know whether she has been enrolled.[5]  Wegman Suppl. Decl. ¶¶ 4-5.  She states that she "experienced great difficulty" completing the registration process, that she experienced long wait times, and she was once told to "shut up" by an enrollment specialist.  *Id.*  One of Wegman's PAs, who cares for her on the weekends, filed an affidavit stating that he attempted to enroll several times, but was unsuccessful because the "enrollment system will not recognize Ms. Wegman's PPL ID number."  *See* Wegman Decl. ¶ 6; Williams Suppl. Decl ¶ 3.

Though Wegman and Sternfeld have described some regrettable experiences with the enrollment process, none of the Plaintiffs or MCCC members here demonstrated that they or their PAs will not be able to enroll.  Plaintiffs' allegation that in the future they may be institutionalized or experience a gap in care remains wholly speculative, rather than certainly impending, especially considering the *Engesser* Preliminary injunction, which grants plaintiffs additional time to enroll and additional help with the enrollment process.  *See Engesser*, No. 25-cv-01689-FV-LKE (E.D.N.Y. April 10, 2025) [ECF No. 62].[6]  Moreover, if any of these Plaintiffs or MCCC members

---

[5] In a subsequent letter, Plaintiffs' Counsel states that "we believe [Wegman's] enrollment in PPL . . . is complete." [ECF No. 48].  This fact might moot Wegman's claim, at least to the extent it relies on PPL's lack of outreach or Wegman's inability to enroll.  But a statement in a letter from Plaintiffs' counsel, unsworn by Wegman, is not "evidence outside the pleadings" that the Court may consider.  *Makarova*, 201 F.3d at 113; *cf. Everytown for Gun Safety Action Fund, Inc. v. Defcad, Inc.*, No. 21-CV-8704, 2022 WL 1689638, at *2 (S.D.N.Y. May 26, 2022) (finding unsigned declaration of "no evidentiary worth"); *Sam Jin World Trading, Inc. v. M/V Cap San Nicolas*, 2010 WL 267847, at *3 (S.D.N.Y. July 2, 2010) (unsworn affirmations "are inadmissible").  However, the Court notes that it is unfair for Plaintiffs to benefit from an affidavit including a statement Plaintiffs now know is false—i.e. that Wegman does not know if she is enrolled—simply because Plaintiff did not file a proper declaration to correct the record.

[6] In letters filed after the briefing, the parties dispute the significance of a March 25, 2025 NYS DOH announcement that they would allow a 30-day late registration window, which would allow consumers and PAs to continue in CDPAP while completing their transition to PPL.  [ECF Nos. 49–52].  Defendant asserts that the window will allow any Plaintiff and his or her PAs who have not completed enrollment to do so.  [ECF No. 49].  Plaintiffs assert that the late registration window is meaningless because PAs who register late will still go unpaid in the month of April until they register.  The *Engesser* Preliminary Injunction renders arguments about the 30-day later registration window moot, because it allows PAs to continue to be paid while they and the consumers they serve continue to enroll over the next two months.  *See Engesser*, No. 25-cv-01689-FV-LKE (E.D.N.Y. April 10, 2025) [ECF No. 62].

choose not to enroll of their own volition and thus experience gaps in their care, such as Rodriguez or Jones who have not testified to any attempts to enroll, they cannot create standing through a self-inflicted harm which breaks the causal chain. *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013), *as amended* (Mar. 21, 2013) (citing *See St. Pierre v. Dyer,* 208 F.3d 394, 403 (2d Cir.2000)) (a plaintiff may not establish injury for standing purposes based on a "self-inflicted" injury which is "so completely due to the plaintiff's own fault as to break the causal chain.").

Next, Plaintiffs assert that PPL "will pay a large number of PAs less than they are currently earning." Pl. Reply at 15 (citing Compl. ¶ 127 and citing Perrin Decl. ¶ 5). Again, Plaintiffs allege that future potential pay cuts will cause PAs to quit, which will lead to consumers' institutionalization. Pl. Reply at 18. Plaintiffs' allegations regarding pay cuts also do not establish a particularized and concrete harm. PPL has sent offer letters to Personal Assistants who work for consumers in New York City offering $19.10 per hour, which is minimum wage for a home care aide in New York City. Compl. ¶ 127; N.Y. Pub. Health Law § 3614-f(2)(c)(i). Plaintiffs conclude from this letter that "[i]t is clear that PPL will be paying minimum wage throughout the state." Compl. ¶ 127. This is not a reasonable inference to draw from an unknown number of offer letters sent to PAs in one city. The Court need not credit Plaintiffs' conclusory statement that PPL will enforce minimum wages throughout the state. *See Iqbal*, 556 U.S. at 686. In further support of their conclusion that PPL will only pay minimum wage to all PAs statewide, Plaintiffs point to one sentence in the declaration of the president of PPL. Pl. Reply at 23 (citing Perrin Decl. ¶ 5). The sentence states that on February 3, 2025 PPL published the hourly base wage on its website, and provides a link. Perrin Decl. ¶ 5. That February 3, 2025 link is no longer operative. Plaintiffs assert that the PPL publication at that link "*confirms* that PPL will pay most PAs the minimum

wage rate of $18.10, PAs in NYC $20.10 (one dollar above minimum wage in NYC), and PAs in NYC's neighboring counties $19.50 (40 cents above minimum wage)." Pl. Reply at 23 (emphasis added). However, PPL's current page for the "NY Consumer Directed Personal Assistance Program" states that these published rates are merely "minimum base wage rates." *See* NY CONSUMER DIRECTED PERSONAL ASSISTANCE PROGRAM (CDPAP), PPL, https://pplfirst.com/programs/new-york/ny-consumer-directed-personal-assistance-program-cdpap/ (last visited Apr. 13, 2025). Without more, Plaintiffs have not established that all PPL will pay all PAs minimum wage.

Importantly, Plaintiffs have also not established that their PAs *in particular* will experience pay cuts or that any pay cut would result in a harm particularized to them. The Complaint merely vaguely alleges that "many" PAs earn above minimum wage, and the speculation that those PAs "can expect a pay cut from PPL." Compl. ¶ 149. The Complaint does not allege that any of the PAs for Plaintiffs or MCCC members earn more than minimum wage. *See id.* Only one declaration in this case has stated that a Plaintiff's PAs earn more than minimum wage. Wegman Suppl. Decl. ¶ 9. Wegman has stated generally that her PAs "only earn a little more than the minimum wage." *Id.* This statement certainly does not suggest that all of her PAs will suffer a pay cut, much less certainly quit if their pay is slightly reduced.

Only one of the PAs who have filed declarations in this case, Jessica Holler, has stated that she would certainly quit *if* her wages were reduced. *Compare* Holler Decl. ¶ 3 *with* Mattias Decl., Cowart Decl., Williams Decl. Jessica Holler works for Plaintiff Spencer on a part time basis on a team of three PAs in Spencer's employ. Spencer Decl. ¶ 16; Holler Decl. ¶ 2. Spencer's alleged harm that Holler *may* leave, Spencer *may* be unable to replace her or have other PAs cover her

time, and thus she *may* experience a health crisis or institutionalization, remains speculative.

Finally, Plaintiffs contend that PPL will be unable to pay PAs because (1) it failed to obtain contracts with MMCOs and (2) it does not have the cash to pay the PAs. Pl. Reply at 15 (citing Compl. ¶¶ 8, 72, 115, 120-23, 127 and citing Perrin Decl. ¶ 27, 32). Again, these allegations do not remedy the speculative nature of Plaintiffs' alleged harm. Plaintiffs state conclusorily that a Fiscal Intermediary *must* have cash in reserve to be able to make payments, because it "typically" takes Medicaid insurers, or Medicaid Managed Care Organizations ("MMCOs"), about 45 days to process reimbursement, while payments to PAs are made weekly or bi-weekly. Compl. ¶¶ 72, 120. To support their contention that PPL has insufficient funds to pay PAs, Plaintiffs cite to the declaration of the president of PPL in which she affirms that PPL has secured only a $100 million line of credit while the monthly CDPAP payroll is approximately $750 million. Pl. Reply at 15 (citing Perrin Decl. ¶¶ 27, 32). Moreover, Plaintiffs allege that PPL has failed to obtain contracts with MMCOs so they can be reimbursed with Medicaid funds. Pl. Reply at 15 (citing Compl. ¶¶115, 122–23). In the Complaint, Plaintiffs state that MMCOs refused to contract with PPL because PPL requested that the MMCOs should agree to prepay PA wages. Compl. ¶ 121.

It appears MMCOs have since capitulated. By February 27, 2025, PPL had entered into contracts with 33 of the 34 MMCOs, which cover the vast majority of CDPAP consumers, Def. Reply at 3 (citing Perrin Reply Decl. ¶¶ 3–4),[7] and eight of the largest MMCOs had agreed to advance funds to PPL each week to cover the costs for PAs providing care to enrolled consumers. Perrin Reply Decl. ¶ 10. This information was current as of February 27, 2025, which was more than a month before the initial effective date of the CDPAP Amendment and several months before the new deadlines for enrollment established by the *Engesser* Preliminary Injunction. Def. Reply

---

[7] As McDonald points out, Plaintiffs have not named the MMCOs in which they are enrolled and have thus not clearly alleged that their MMCO has not contracted with PPL. *See* Def. Reply at 3 n.3.

at 3. That new facts have been unfolding throughout the briefing of the pending motions in this case is further evidence that this case is not ripe. *See Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 415 (S.D.N.Y. 2012) (quoting *All. of American Insurers v. Cuomo*, 854 F.2d 591, 599 (2d Cir. 1988)) (courts are "inclined to find standing" if it can be said that "'there is no better time' to resolve the issues raised by the parties—that is, when they 'will be in no better position later than now.'"). Based on the record before the Court, Plaintiffs have not established by a preponderance of the evidence that PPL will be unable to pay PAs, and thus they have certainly not shown that their PAs will consequently quit, they will be unable to replace those PAs and will therefore experience a medical harm or institutionalization. *See Nouritajer*, 18 F.4th at 88 (citing *Makarova*, 201 F.3d at 113).

Accordingly, the Court concludes that Plaintiffs' claims are not ripe, Plaintiffs lack standing, and this case should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## III.    Plaintiffs' Are Not Entitled to a Preliminary Injunction

Since the Court is dismissing Plaintiffs' claims for lack of standing and ripeness, Plaintiffs' motion seeking a preliminary injunction is denied as moot.[8] *See, e.g.*, *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 121 (2d Cir. 2025) (District Courts "*cannot* consider the merits of [a] preliminary injunction motion and should dismiss [a] claim altogether" if a plaintiff's legal theory "doom[s] the plaintiff's standing.") (emphasis in original); *Jeannot*, 2025 WL 80689, at *15 (denying a motion for preliminary injunction since it granted defendant's motion to dismiss); *Miller v.*

---

[8] Moreover, the *Engesser* Stipulated Preliminary Injunction moots at least the section of Plaintiffs' motion for preliminary injunction which sought to allow FIs to continue providing services after March 31, 2025. [ECF No. 5]; *see Engesser*, No. 25-cv-01689-FV-LKE (E.D.N.Y. April 10, 2025) [ECF No. 62] (extending the enrollment deadlines to dates after March 31, 2025 and allowing PAs to be paid by their prior FIs while they and the consumers they serve continue to enroll with PPL).

*McDonald*, 720 F. Supp. 3d 198, 218 (W.D.N.Y. 2024) (denying plaintiffs' motion for a preliminary injunction as moot because "[t]he Court's determination that Plaintiffs' claims must be dismissed eliminates any possibility that the Court could grant their request for preliminary injunctive relief"); *Kearns v. Cuomo*, 415 F. Supp. 3d 319, 337 (W.D.N.Y. 2019), *aff'd*, 981 F.3d 200 (2d Cir. 2020) (denying a motion for preliminary injunction as moot because "[t]he Court's determination that it lacks subject matter jurisdiction over Plaintiff's claims eliminates any possibility that the Court could grant Plaintiff's request for preliminary injunctive relief."); *Lower E. Side People's Fed. Credit Union v. Trump*, 289 F. Supp. 3d 568, 582 (S.D.N.Y. 2018) (denying plaintiff's motion seeking a preliminary injunction as moot since plaintiff failed to demonstrate that it had standing).

## IV.    Plaintiffs' Letter Motion to File Additional Exhibits

After briefing on the motions was completed, Plaintiffs filed a letter motion requesting leave to file a letter written by an advocacy group to NYS DOH and a directive from NYS DOH to MMCOs. ECF No. 46 ("Pl. Letter Mot.")].  The Court has reviewed Plaintiffs' letter, including the summaries of the contents of the two proposed exhibits, and has determined that these documents would not alter the Court's above analysis.  Moreover, Plaintiffs have not demonstrated in their letter why the Court may consider the proposed exhibits for the truth of the matters asserted within them.  *See Doherty*, 101 F.4th at 172 (on a 12(b)(1) motion the Court may consider affidavits and "evidence outside the pleadings," but it may not rely on conclusory or hearsay statements contained in affidavits); *Mullins v. City of New York*, 626 F.3d 47, 51-52 (2d Cir. 2010) (in considering a motion for a preliminary injunction, the Court may rely on affidavits, depositions, and sworn testimony even if they include hearsay); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (in considering a 12(b)(6) motion to dismiss, the Court may consider the

documents incorporated by reference or integral to the complaint). Accordingly, Plaintiffs' request to supplement the record is DENIED.

## **CONCLUSION**

For the reasons stated above, the motion to dismiss is GRANTED and this case is dismissed without prejudice. IT IS FURTHER ORDERED that the motion for a preliminary injunction and letter motion to file additional exhibits are HEREBY DENIED. The Clerk of Court respectfully is requested to terminate the motion at docket entries 5, 26, and 46 and to close this case.

**SO ORDERED.**

**Date:  April 24, 2025**
       **New York, NY**

                                          **MARY KAY VYSKOCIL**
                                          **United States District Judge**